**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-7024**

───────────────

UNITED STATES OF AMERICA,

                Petitioner – Appellee,

     v.

CHRISTOPHER PERKINS,

                Respondent – Appellant.

───────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:09-hc-02062-BR)

───────────────

Argued: September 21, 2021                           Decided: May 4, 2023

───────────────

Before AGEE and WYNN, Circuit Judges, and Frank W. VOLK, United States District Judge for the Southern District of West Virginia, sitting by designation.

───────────────

Vacated and remanded by published opinion. Judge Volk wrote the majority opinion, in which Judge Wynn concurred. Judge Agee filed an opinion concurring in the judgment.

───────────────

**ARGUED:** Jennifer Claire Leisten, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Genna Danelle Petre, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Robert J. Higdon, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

───────────────

VOLK, District Judge:

This appeal presents two consequential questions. Both relate to the continued involuntary commitment of those afflicted with a mental illness. A commitment wrongly perpetuated is an unwarranted restraint of liberty; a commitment errantly discontinued poses a danger to the committee and the public. *See United States v. Bilyk*, 949 F.2d 259, 261 (8th Cir. 1991) (quoting *United States v. Clark*, 893 F.2d 1277, 1282 (11th Cir. 1990)) (noting the district court is entrusted with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe.'"); *United States v. Williams*, No. 22-6464, 2022 WL 16984705, at *5 (4th Cir. Nov. 17, 2022) ("Refusing to release a person who has served a criminal sentence based on a prediction that it would be too dangerous to do so is serious business."); *id.* at *6 (Richardson, J., dissenting) (noting these types of cases require "tough predictive judgment[s]....").

First, we are asked to set the proof standard necessary to support revocation of conditional discharge under 18 U.S.C. § 4246(f). No circuit has exhaustively addressed the question. Second, we consider the process by which the district court should make and support its crucial findings on dangerousness under § 4246(f) (the "dangerousness inquiry" or "risk assessment"). While there have been profound developments in the science of risk assessment in the past three decades, they are unmatched by updated, corresponding legal guidance respecting how the inquiry ought to proceed for those under a federal civil commitment order. We thus write at some length.

The district court did not have the benefit of the analyses within. We consequently vacate and remand for further proceedings.

2

## I.

### A.  *Factual Background*

On July 10, 2007, a criminal complaint was filed against Christopher Perkins. As discussed more fully within, he threatened a United States congressman. *See* Criminal Complaint, *United States v. Perkins*, No. 3:07-MJ-226, ECF No. 1 (W.D. Ky. July 10, 2007). Mr. Perkins was deemed incompetent and unlikely to be restored in the foreseeable future. *See* Order, *Perkins*, No. 3:07-MJ-226, ECF No. 31. Mr. Perkins was then evaluated for dangerousness by the Bureau of Prisons ("BOP") at Federal Medical Center Butner ("FMC Butner"). *Id.* On May 20, 2009, a certificate of mental disease or defect and dangerousness issued pursuant to 18 U.S.C. § 4246. It was subsequently filed in the United States District Court for the Eastern District of North Carolina. J.A. 3, 16.[1] The district court found that Mr. Perkins was "suffering from a mental disease or defect, as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." *Id.* at 21. On December 7, 2009, Perkins was committed civilly to the custody of the Attorney General. *Id.* at 21.

Mr. Perkins' mental condition improved with treatment. *See id.* at 22–23. On May 3, 2010, the district court ordered his conditional discharge. *Id.* at 41. Mr. Perkins returned home and lived with his mother. *Id.* at 42. In 2011, however, Mr. Perkins violated his

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

conditional discharge. *Id.* at 54. The district court revoked the term and recommitted him. *Id.*

On March 6, 2018, the United States certified his improved mental condition. It requested conditional discharge anew pursuant to 18 U.S.C. § 4246(e). *Id.* at 60–70. The district court conditionally released Mr. Perkins again on March 7, 2018. *Id.* at 78. The United States Probation Office for the Western District of Kentucky undertook supervision. *Id.* at 78–83. Nineteen conditions of release were imposed, including the following:

> Condition 3: Reside at, and abide by the rules of, Fern Terrace Residential Care Facility ("Fern Terrace");
>
> Condition 4: Participate in global positioning service ("GPS") monitoring;
>
> Condition 6: Actively participate in mental health care;
>
> Condition 7: Take all prescribed medications; and
>
> Condition 15: No travel beyond the jurisdiction without permission of the supervising United States Probation Officer.

*Id.*

On February 5, 2019, Mr. Perkins' supervising United States Probation Officer notified the district court of certain violations. He identified Conditions 3, 4, 6, 7, and 15. J.A. 90–91. He alleged Mr. Perkins (1) refused to follow Fern Terrace rules, (2) repeatedly failed to maintain his GPS monitor, resulting in false alerts, (3) refused to meet with his psychiatrist and take prescribed medications, and (4) failed to receive permission before leaving the district. *Id.*

On February 6, 2019, the government moved to revoke Mr. Perkins' conditional discharge. *Id.* at 84. On February 8, 2019, a bench warrant issued. *Id.* at 10–11. He was apprehended the same day. *Id.*

## B.    *Procedural Background*

On April 29, 2019, Mr. Perkins appeared for a revocation hearing. J.A. 96–106. The district court treated the probation officer's report as evidence and recited in detail its allegations:

> It is alleged that he violated condition No. 3 by failing to abide by all the rules established by the housing facility in that on November 15th, 2018, Mr. Perkins reported during a resident counsel [sic] meeting at Fern Terrace that he had bottles of vitamins in his room which are not allowed. All medicines, including over-the-counter medicine, must be distributed by the Fern Terrace staff and are not permitted in residents' rooms.

> When confronted, Mr. Perkins refused to give the vitamins to the staff and locked them in his cabinet with a padlock. The staff called the Probation Officer, Mr. McChesney, who responded to the site and spoke to Mr. Perkins. Mr. Perkins then refused the officer's instructions to unlock his cabinet and give the vitamins to the staff who could give them to him with his medications. And the staff had to cut the lock off . . . Mr. Perkins' cabinet to retrieve the vitamins.

> On June 28, 2018, it is alleged that Mr. Perkins took another resident's money to purchase fast food and returned without giving the resident the food or money.

> And it was also determined that Mr. Perkins had falsified the sign-out log at Fern Terrace on that date.

> It's alleged that Mr. Perkins has violated the condition No. 4 which requires him to participate in active GPS location for 12 months.

> And it is alleged that on the following dates, Mr. Perkins failed to change his battery as instructed, which resulted in low battery alerts that had to be addressed usually in the middle of the night: April 3rd, 2018; April 5th, 2018; April 7th, 2018; April 14th, 2018; April 15th, 2018; May 7th, 2018;

July 7th, 2018; October 3rd, 2018; February 1st, 2019; and February 3rd, 2019.

The officer stated that he counseled Mr. Perkins multiple times after these alerts on how and when to change the battery in his monitor.

It is alleged that he has violated . . . condition No. 6, which . . . requires him to maintain active participation in a regimen of mental health care, which may include inpatient or outpatient residential treatment as directed by his U.S. probation officer and to follow all rules, regulations, instructions of the treatment staff and comply with the treatment regimen recommended by the treatment providers.

Further provides that any change in the mental health providers must be approved in advance by the probation officer. In this report it is alleged that Mr. Perkins on December 18th, 2018, refused to see the psychiatrist at the facility where he was living.

Condition No. 7 requires the respondent to take all medications prescribed to him by his treatment providers. And it is alleged that on multiple dates, Mr. Perkins refused to take different medicines prescribed for him.

Condition No. 15 requires respondent to not travel out of the Federal Judicial District without prior approval of his probation officer; and it is alleged that on August 8, 2018, Mr. Perkins requested and was permitted -- given permission by the Fern Terrace staff to go to a local hospital for an illness two times and that he left the hospital and traveled with his mother to a hospital in Nashville, Tennessee which is outside the Western District of Kentucky without permission of his probation officer.

*Id.* at 98-100. Counsel for Mr. Perkins stated her client "denie[d] the violations." *Id.* at 101, 104–05. The district court then provided Mr. Perkins an opportunity to respond to the allegations. *Id.* at 105.

Mr. Perkins told the district court he left the jurisdiction due to a medical emergency; he added his probation officer "said that [was] okay with him [and] to keep him posted." *Id.* at 101–02. Mr. Perkins also said he tried to follow the Fern Terrace rules

6

as best he could. *Id.* at 103. He too denied the alleged violations. *Id.* at 101, 104–05. He

added as follows:

> I wasn't given a lot of rules in the first three or four days adjusting to living
> at Fern Terrace. And they had some of the rules posted on the wall so I read
> those and reread those before this here. And Jodie Key, assistant
> administrator, and Valerie didn't give me much communication that I was
> causing a lot of problems at Fern Terrace.

*Id.* at 100. The district court asked Mr. Perkins' counsel if she desired to question him. *Id.*

She declined. *Id.* The district court again asked if there was any additional evidence to be

taken. *Id.* None was offered. *Id.*

After finding Mr. Perkins violated his conditional discharge (J.A.104), the district

court observed as follows:

> Well, Mr. Perkins, I'm going to have to find that you have violated the terms
> and conditions of your conditional release and recommit you, which isn't to
> say that you can't get out again on conditional release; but it's obvious to me
> that you have somehow allowed the problems of other people, some in the
> facility where you live and primarily your mother, to take priority over your
> requirement that you abide by the conditions of the supervised release that
> you were under. You need to understand that when you are released on
> supervised release, you are under the daily control of your United States
> Probation Officer and when that probation officer tells you something, like
> he told you to unlock that safe in your room, your door — drawer or
> whatever, that is just like the Court speaking to you and if you don't do that,
> you're violating this Court's order and we just can't operate that way. You're
> going to have to live up to the terms and conditions of your supervised release
> if you are allowed to leave again.

*Id.* at 104–05. Mr. Perkins was then recommitted pursuant to 18 U.S.C. § 4246(f). J.A. 105,

107.

On June 21, 2019, Mr. Perkins appealed. *Id.* at 11. He noted the district court failed

to find, as required by § 4246, that he posed a substantial risk of bodily injury to another

7

person or serious damage to the property of another. *See* Brief of Appellant, *United States v. Perkins*, No. 19-6893, ECF No. 16, at *20–21 (filed Nov. 26, 2019). The United States moved to remand in light of *United States v. Taylor*, 776 F. App'x 155 (4th Cir. 2019). J.A. 111–12. On February 28, 2020, we remanded as requested "for a rehearing as to whether [Mr. Perkins'] continued conditional release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . ." *Id.* at 108.

On June 1, 2020, the district court convened the rehearing. *Id.* at 122–44. It fully discussed the procedural posture to that point and, in painstaking detail, recited the violations alleged by the probation officer. *Id.* at 125. The district court, *inter alia*, recited (1) its review of the transcribed April 29, 2020, hearing, (2) the probation officer's memorandum, and (3) a letter from Fern Terrace Administrator Valerie Carter. *Id.* at 126–27. Mr. Perkins' counsel stated it was unnecessary to repeat the entire April 27, 2019, proceeding. *Id.* at 125–26. She said Mr. Perkins continued to deny the alleged violations. *Id.* at 126.

Mr. Perkins' counsel asserted Fern Terrace was a "bad fit." She added none of the alleged violations, if true, warranted a dangerousness finding. *Id.* at 128–29. The government responded that revocation was necessary given "an overwhelming series of events that are fairly typical of Mr. Perkins' past." *Id.* at 131. It emphasized "a pattern of Mr. Perkins not following [the] Court's order but doing so in a way that does increase his risk," which "escalate[s] his conduct and deteriorate[s] his mental health behavior." *Id.* at 134. The government forecasted a further decline if Mr. Perkins was "going to be discharged" from Fern Terrace, "potentially [become] homeless" and lack "the medications

8

. . . he needs." *Id.* at 131. Absent revocation, the government feared Mr. Perkins would regress to his 2009 status. *Id.* at 135. Mr. Perkins spoke and continued to deny the alleged violations. *See id.* at 135–37.

After hearing argument, the district court -- a judicial officer deeply experienced in the subject matter -- expressed misgivings about the criteria governing revocation:

> This is a very new area for the Court to get into. In the past, I had felt — and I guess I still do — that violation of the order of conditional release is in itself a qualification for — a reason for revocation of conditional release and recommitting the respondent to the custody of the Attorney General.
>
> I really don't — and I hope the Fourth Circuit will amplify what it meant by having to find these additional requirements.

*Id.* at 138–39. These uncertainties were immediately followed by the district court's ruling on remand:

> I find as a fact that [Perkins] has violated the terms and conditions of his conditional release by violating condition No. 3 in that he left the facility and went elsewhere without permission of the people at the facility; that he is violating condition No. 4 because he has failed to participate in the GPS location monitoring system as required; that he violated condition No. 6 in that he has refused to see his psychiatrist; and that he has violated condition No. 7 in that he has not taken all of his medications as required; and that he has violated condition No. 15 by traveling outside of the divisional district without the prior approval of the probation officer.
>
> Now all of those things together I feel constitute reasons why this Court should find him in violation of his conditional release plan.

*Id.* at 139. The district court continued:

> An implicit part of the commitment — and I think I've had some cases before where I revoked the conditional release because the committee was declared *persona non gratis* by the facility in which he was staying, which isn't to say that this Court doesn't believe that Mr. Perkins is not ready for conditional release again. He may very well be, and I hope he is. And I always tell the committees that when I revoke their commitment, and send

9

them back to the facility from which they came, that I hope and have every confidence that the mental health authorities at that facility are going to be working on and will soon submit to me another plan of conditional release.

*Id.* at 140.

The district court then found "the violations heretofore set out depicting the conduct of the defendant during his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." *Id.* at 141. Mr. Perkins was then recommitted to the custody of the Attorney General. *Id.* at 141–42, 145–46. On July 13, 2020, he noticed this appeal. *Id.* at 147.

## II.

We review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Cox*, 964 F.2d 1431, 1433 (4th Cir. 1992) ("The trial court's ruling denying [the committed person's] unconditional release . . . is a factual determination that will be overturned by this court only if clearly erroneous."); *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) ("On appeal, we review the district court's factual findings for clear error and its legal conclusions de novo.").

## III.

Our two recent decisions in *United States v. Curbow*, 16 F.4th 92, 95 (4th Cir. 2021) and *United States v. Wayda*, 966 F.3d 294, 296 (4th Cir. 2020), discuss the statutory sections found in Chapter 313 of Title 18 dealing with "Offenders with Mental Disease or Defect." 18 U.S.C. § 4241-4248. Our focus is much narrower, dealing exclusively with § 4246. We thus lean on the § 4246 statutory explanations found in *Curbow* and *Wayda*.

10

Section 4246 addresses three types of inmates, namely, (1) those in federal custody for whom a sentence is about to expire, (2) those over whom the Attorney General has custody as a result of their inability to stand trial due to a mental disease or defect, and (3) those against whom all criminal charges have been dismissed due or related to their mental disease or defect. 18 U.S.C. § 4246(a); *Curbow*, 16 F.4th at 96. As noted in *Wayda*:

> Section 4246 . . . govern[s] the federal process for civil commitment of particular persons in the government's custody whose mental condition renders them a potential threat. Section 4246 has long provided a procedure for commitment of an individual who "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another."

*Wayda*, 966 F.3d at 297 (quoting 18 U.S.C. § 4246(a)).

The statute permits the director of a facility to certify an inmate housed there as "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another . . . [('the dangerousness certification')]." 18 U.S.C. § 4246(a); *Curbow*, 16 F.4th at 95–96. Importantly, the dangerousness certification must be preceded by the facility director's finding "that suitable arrangements for State custody and care of the person are not available." 18 U.S.C. § 4246(a).

The dangerousness certification triggers a hearing. 18 U.S.C. § 4246(a); *Curbow*, 16 F.4th at 96. The inmate is entitled to appointed counsel, the right to confront and cross examine adverse witnesses, and an opportunity to present evidence, including his own testimony and that of subpoenaed witnesses. 18 U.S.C. §§ 4246(a), 4247(d).

11

The district court is authorized to "order that a psychiatric or psychological examination of the defendant be conducted." *Curbow*, 16 F.4th at 97. A report of that examination is then filed in accordance with the provisions of § 4247(b) and (c). *Id*. Section 4247(b) permits the defendant to select an additional examiner of her choosing. And § 4247(c) sets forth a nonexclusive list of background and diagnostic findings to be addressed in the report. These include (1) the subject's history and present symptoms, (2) the tests administered and the results obtained, (3) the findings, and (4) the diagnosis, prognosis, and the central opinion respecting whether the subject is dangerous as defined in the statute. 18 U.S.C. § 4247(c)(1)-(4).

Following receipt of the examination report(s), the hearing convenes. Subsections (d) and (e) of § 4246 respectively set forth (1) the process for adjudicating and placing the subject, if warranted, and (2) later discharging him from custody. Section 4246(d) provides as follows:

> If, after the hearing, the court finds *by clear and convincing evidence* that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General [("the dangerousness adjudication")].

18 U.S.C. § 4246(d) (emphasis added). The initial dangerousness adjudication is thus subject to the clear and convincing proof standard.

Section 4246(e) governs the potential discharge of the individual earlier committed under § 4246(d). The provision states pertinently as follows:

> (e) Discharge.--When the director of the facility in which a person is hospitalized pursuant to subsection (d) determines that the person has

12

recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the person's counsel and to the attorney for the Government. The court shall order the discharge of the person or, on the motion of the attorney for the Government or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine whether he should be released. If, after the hearing, the court finds *by a preponderance of the evidence* that the person has recovered from his mental disease or defect [("the recovery adjudication")] to such an extent that--

> (1) his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or

> (2) his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall--

>> (A) order that he be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or treatment that has been prepared for him, that has been certified to the court as appropriate by the director of the facility in which he is committed, and that has been found by the court to be appropriate; and

>> (B) order, as an explicit condition of release, that he comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment.

The court at any time may, after a hearing employing the same criteria, modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment.

18 U.S.C. § 4246(e). The recovery adjudication is thus subject to a preponderance of the evidence standard.

13

The next step -- and the subsection at the center of this appeal -- is found in § 4246(f) dealing with "[r]evocation of conditional discharge." The subsection provides as follows:

> (f) Revocation of conditional discharge.--The director of a medical facility responsible for administering a regimen imposed on a person conditionally discharged under subsection (e) shall notify the Attorney General and the court having jurisdiction over the person of any failure of the person to comply with the regimen. Upon such notice, or upon other probable cause to believe that the person has failed to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, the person may be arrested, and, upon arrest, shall be taken without unnecessary delay before the court having jurisdiction over him. The court shall, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another [("the revocation adjudication")].

18 U.S.C.A. § 4246(f).[2] The revocation adjudication mentions no proof standard, unlike subjections 4246(d) and 4246(e) immediately preceding it.

## IV.

Before proceeding to the analysis, we deem it useful to provide some context. There is a considerable history giving rise to the current federal civil commitment process. Some of it is important for resolving both questions before us.

### A.    *The Origins of Offender Mental Health Treatment in the United States*

In 1773 -- in part to stem then-inexplicable, and even criminal, behavior by some -- the first facility for the mentally ill opened in Williamsburg, Virginia. The Public Hospital

---

[2] Section 4246(f) is materially identical to 18 U.S.C. § 4243(g), a provision dealing with revocation of conditional discharge for hospitalized persons found not guilty by reason of insanity.

14

for Persons of Insane and Disordered Minds[3] ("Public Hospital") was -- as put by the Earl of Dunmore, then-colonial Governor of Virginia -- devoted to "'a poor unhappy set of people who are deprived of their senses and wander about the countryside, terrifying the rest of their fellow creatures.'" Michael Toren, *Shuttered: An Examination of How the 2013 Chicago Public School Closings Are Denying Special Education Students the Right to an Appropriate Public Education*, 35 N. Ill. U. L. Rev. 231, 235 (2014) (citation omitted); *see* Paul S. Appelbaum, *A History of Civil Commitment and Related Reforms in the United States: Lessons for Today*, 25 Dev. Mental Health L. 13, 13 (2006) ("By the end of the Colonial Period and into the early years of the Republic, jails and almshouses were filled with people with mental illness.").

The only facility of its kind until 1824, the Public Hospital consisted of "dungeon-like cells" and "torturous . . . treatment." Toren, *supra*, at 235. The Public Hospital and its methods -- with the comparatively brief, humanitarian interregnum represented by Benjamin Rush's "Moral Treatment" movement -- were the standard fare through the mid-1800s. *Id.* (noting that after the Civil War "Patient care reverted to pre-Revolutionary War

---

[3] The use of the word "insane" and similar pejorative references is understandably discouraged. *See, e.g.*, AP Style Book ("Do not use derogatory terms, such as insane, crazy/crazed, nuts or deranged, unless they are part of a quotation that is essential to the story."). We regret the necessity of resurfacing these justifiably long-abandoned, objectionable terms. It is necessary, in part, however, to demonstrate that as the science related to the subject conditions has matured, so too hopefully has the surrounding rhetoric and perception. It is also necessary to aid an appreciation of sociolegal developments and the statutory context. We have confronted similar concerns about outmoded parlance recently. *See Miranda v. Garland*, 34 F.4th 338, 345 n.1 (4th Cir. 2022) ("Our use of the term 'alien' is not intended to express any opinion, pejorative or otherwise, about the plaintiffs in this action or others challenging their detention under our immigration laws.").

conditions"); Stacey A. Tovino, *Psychiatric Restraint and Seclusion: Resisting Legislative Solution*, 47 Santa Clara L. Rev. 511, 520 (2007); Destiny Howell, *The Unintended Consequences of Deinstitutionalization*, 54 Am. Crim. L. Rev. Online 17, 18 (2017).

In 1841, however, the legendary Dorothea Dix "began a crusade to reform the treatment of mentally ill inmates after witnessing firsthand the abhorrent care those individuals received." Robert Rigg, *Are There No Prisons: Mental Health and the Criminal Justice System in the United States*, 4 U. Denv. Crim. L. Rev. 103, 103–04 (2014). By 1880, Ms. Dix had proven instrumental in establishing "32 mental hospitals" in various states, a near ten-fold increase in such facilities existing when her work commenced. *Id.* at 104; *see* Adam Klein & Benjamin Wittes, *Preventive Detention in American Theory and Practice*, 2 Harv. Nat'l Sec. J. 85, 158 (2011) ("The ensuing conclusion that confinement in newly constructed asylums would be a salutary policy benefiting the mentally ill was propagated by, among others, the humanitarian campaigner Dorothea Dix."); *Death of Dorothea Dix*, Biddeford Daily J., July 20, 1887, at 1 (noting "[s]he was instrumental in having the asylum founded . . . throughout the country. . . . [and] in 1854 a bill was passed granting 10,000,000 acres for the purpose but the measure was vetoed by President Pierce."); Reuben L. Lurie, Massachusetts Commissioner of Corrections, Diamond Jubilee Meeting of the American Bar Association at the Harvard Club of Boston, *Today's Problems in the Administration of Criminal Justice*, 15 F.R.D. 65, 80 (Aug. 26, 1953) ("The result was that there was a reform in the treatment not alone of prisoners, but also of the insane in Massachusetts, and then Dorothea Dix began the same trek. She went into Rhode Island. She went into New York. She went into New Jersey, and finally she had

16

traversed twenty-two states in the Union. She memorialized the Congress. She went to Europe. She brought about lasting reforms in England, in France, in Italy, in Turkey, and in Russia.").[4]

Ultimately, however, the well-intended asylum facilities became overcrowded and inadequately funded; they too soon began to resemble a more modernized version of the pre-Revolutionary War conditions instead of the therapeutic sanctuaries envisioned by Ms. Dix and her devotees. *See* Howell, *supra*, at 18–19 ("Asylums workers had less time to attend to individual patients and the facilities required more upkeep. . . . From the 1900's to the 1940's, forced sterilization, lobotomization, and electroshock therapy all emerged as acceptable treatment options for the mentally ill."). Additionally, "[t]he inpatient population of mental hospitals in the United States grew from 187,000 in 1910 to 425,000 in 1940, demonstrating the 'pervasive . . . faith in an institutional policy' of mental illness control." *See* Klein & Wittes, *supra*, at 160 (quoting Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 167 (1994)).

## B.    *Deinstitutionalization and Congressional Action After World War II*

---

[4] Ms. Dix's desire for a federal facility for mentally ill inmates ultimately materialized with an Act of Congress in 1930. The law authorized the Attorney General, *inter alia,* to select a site and report to Congress the cost of acquisition or construction. An Act To Establish a Hospital for Defective Delinquents ("Hospital Act"), ch. 254, 46 Stat. 270 (1930) (codified as amended at 18 U.S.C. §§ 871–880 in United States House of Representatives, Committee on Revision of the Laws, *The Code of the Laws of the United States of America* (1933)). As authorized by the Hospital Act, the United States Medical Center for Federal Prisoners ("MCFP") was constructed in the early 1930s on land donated by Springfield, Missouri. As noted within, the facility remains in service as MCFP Springfield. Springfield-Greene County Library District, *Historical Postcards of Springfield, Missouri* (Feb. 6, 2022), https://thelibrary.org/lochist/postcards/index.cfm.

In the years following World War II, the Nation began to reckon with the troubling civil commitment process. Pop culture helped produce the tipping point. A 1946 book entitled *The Snake Pit* by Mary Jane Ward and Albert Deutsch's watershed work *The Shame of the States* were "cultural touchstones" painting exceptionally dark portraits of institutionalization. Blake Erickson, *Deinstitutionalization Through Optimism: The Community Mental Health Act of 1963*, 16 Am. J. of Psych. Residents' J. 6, 6 (2021). Perhaps the most influential and far-reaching piece was a 1946 article in *Life* magazine -- the most widely read news periodical of the day -- which said this: "mental institutions in almost every state . . . . [t]hrough public neglect and legislative penny-pinching, . . . ha[ve] allowed . . . [their] institutions for the care and cure of the mentally sick to degenerate" to deplorable levels. Albert Q. Maisel, *Bedlam 1946: Most U.S. Mental Hospitals Are a Shame and a Disgrace*, *Life*, May 6, 1946, at 102.

This intense scrutiny produced seismic developments and resulted in an increasingly rapid movement toward "deinstitutionalization":[5]

> These revelations shocked the public and undermined confidence in asylums. The passage of the 1963 federal Community Mental Health Centers Act, which funded outpatient treatment, the deinstitutionalization movement, and the development of psychotropic medications all reduced the inpatient population in mental hospitals and shifted public policy away from confining those who could be safely treated in freedom.

---

[5] "Deinstitutionalization refers to the set of policies and treatment innovations driving the half-million-person decrease in the mental hospital population between 1955 and the present." Steven Raphael & Michael A. Stoll, *Assessing the Contribution of the Deinstitutionalization of the Mentally Ill to Growth in the U.S. Incarceration Rate,* 42 J. Legal Studs. 187, 190 (2013).

18

Klein & Wittes, *supra*, at 160.[6]

The federal sovereign was at the tip of the spear respecting progress toward civil commitment reform and deinstitutionalization. For example, in 1946 President Harry Truman signed the National Mental Health Act ("NMHA"), Pub. L. No. 79-487, 60 Stat. 421 (1946). The social context for, and contents of, the NMHA are discussed in a then-contemporary piece from the *Yale Law Journal*:

> INCREASING psychiatric understanding of the nature of mental disease has brought to light the vast scope of the mental health problem. Mental patients now occupy over one half of the hospital beds in the country. In addition to about 600,000 institutionalized cases, it is estimated that at least 8,000,000 of our population suffer from some sort of mental disease. Total annual cost of mental illness, including loss in earning power, amounts to over a billion dollars a year. Pointing up sharply the extent of the drain on national resources by mental disease is the fact that neuropsychiatric disorder was the largest single cause of draft rejections and the cause of forty-one percent of all Army medical discharges.
>
> The critical nature of the problem suggested by these statistics has been recognized by the unanimous passage of the [NMHA] on July 3, 1946. This Act gives authority to the Public Health Service to extend its administration of research, grants-in-aid and fellowships to the field of mental illness and authorizes the establishment of a National Institute of Mental Health along the lines of the National Cancer Institute. It is expected, however, that only those mental patients treated by personnel connected with teaching and research projects will be affected by federal expenditures. Mental health administration is primarily a state responsibility, and the legal procedure involved in the commitment and release of mental patients is, therefore, a subject of state legislation.

---

[6] Psychotropic medications contributed heavily to deinstitutionalization. E. Fuller Torrey, *Out of the Shadows: Confronting America's Mental Illness Crisis* loc. 141 (1997) (ebook) ("Deinstitutionalization began in 1955 with the widespread introduction of chlorpromazine, commonly known as Thorazine, the first effective antipsychotic medication, and received a major impetus 10 years later with the enactment of federal Medicaid and Medicare.").

Note, *Analysis of Legal and Medical Considerations in Commitment of the Mentally Ill*, 56 Yale L.J. 1178, 1178–80 (1947).

### C.      The Judiciary's Role in Modernizing Federal Offender Civil Commitment

The Judiciary was likewise poised for action during this period. And its efforts represented the first steps toward the statutory civil commitment scheme now found in Chapter 313 of Title 18. On September 29, 1942, the Judicial Conference of the United States ("Conference") convened. Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 1 (Sept. 29, 1942) ("1942 Report"). The Conference "authorized the Chief Justice to appoint a committee to study, in cooperation with the Attorney General, the treatment accorded by the federal courts to insane persons charged with crime." *Id.* at 18. The "Committee of the Conference on the Treatment of Insane Persons Charged with Crime in the Federal Courts" ("Committee") was formed two years later. Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 3 (Sept. 26, 1944) ("1944 Report"). The Committee membership included the Honorable Learned Hand, then serving as a Senior Circuit Judge on the United States Court of Appeals for the Second Circuit. 1942 Report at 19.

At the Judicial Conference's September 28, 1943, meeting, the Attorney General noted the continuing importance of the Committee's work, emphasizing "that of 4,600 persons convicted under the Selective Training and Service Act[,] 200 were found to be of unsound mind." Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 3 (Sept. 28, 1943) ("1943 Report"). He further "emphasized the

20

desirability of probation officers giving careful attention to the defendant's mental condition." *Id.*

In 1944, the Committee submitted an interim report, of which the Attorney General "expressed general approval." 1944 Report at 3. In response, at its September 26, 1944, meeting, the Judicial Conference adopted the following resolution:

> It appearing from a study by the Bureau of Prisons that a considerable number of persons are being sentenced for federal offenses and sent to prison who, because of their insanity, should not have been convicted, and who, indeed, because of their mental incapacity to participate rationally in their defense, should never have been arraigned or brought to trial, Resolved, that the Conference recommend:
>
> (1) That the district courts make fuller use of the sum provided in the annual appropriation for psychiatric examinations in occasional criminal cases at the instance of the court, for the purpose of procuring a competent and impartial psychiatric examination of accused persons brought before the court, where from the report of the probation officer or from other indications there is reason to believe that the accused may be mentally unsound;
>
> (2) That wherever possible, arrangements should be made with suitable local hospitals and other institutions and agencies whereby in the discretion of the district courts persons charged with crime may be sent temporarily to such institutions for observation and examination as to their mental condition, as is now done in some districts; and further that the Administrative Office be requested to survey the possibilities of this procedure in the various districts, and if agreeable to the respective district courts to arrange with the officials of local institutions for the use of their facilities for the examination of the mental soundness of persons charged with crime; that for this purpose the Administrative Office be authorized to use the services of the probation officers of the various districts.

*Id.* at 18. The Conference focused the continued work of the Committee on the following: "(1) psychiatric examinations as a matter of course in a class of cases, to be determined, in which the offenders are most apt to be insane; (2) a procedure in other cases for determining

21

before trial the sanity of an accused person; and (3) the protection of courts from insane litigants and a suitable procedure for dealing with such persons." *Id.* at 19.

In 1945, the Attorney General reported to the Conference that "legislation for dealing with mentally afflicted defendants in criminal cases was in the process of preparation in cooperation with the committee of the Judicial Conference on the Treatment of Insane Persons Charged with Crime in the Federal Courts." Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 3 (Sept. 25, 1945) ("1945 Report"). At that same meeting, the Committee submitted, and the Conference approved, its report on the subject assigned:

> The committee presented a revised draft of a bill, prepared in 1944, dealing with cases where insanity occurs after conviction, and with cases of insane persons whose sentences have expired. But the committee did not give its final approval to the draft in its present form, suggesting that it be circulated among the circuit and district judges so that their suggestions may be considered. The bill . . . provides a procedure for . . . where mental incompetency becomes apparent after the defendant has been committed to prison. Further, the bill makes provision for the commitment of any insane prisoner whose sentence is about to expire and whose release might endanger 'the safety of the officers, currency, domain or other interests of the United States.'

*Id.* at 19.

In 1946, the Committee produced draft legislation. On October 1, 1946, the Conference approved it, with certain amendments, and produced the draft of a bill that provided "for the commitment to the Attorney General, upon a judicial proceeding and after a hearing, of any insane prisoner whose sentence is about to expire and whose release might endanger the safety of the officers, the property, or other interests of the United States." Judicial Conference, *Report of the Proceedings of the Judicial Conference of the*

22

*United States* 18 (Oct. 1, 1946) ("1946 Report"). On September 25, 1947, the Conference "reaffirmed" its recommendation of the draft legislation to Congress. Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 18 (Sept. 25, 1947) ("1947 Report").

Reform came in two separate enactments occurring in 1948 ("1948 Enactment") and 1949 ("1949 Enactment"). The 1948 Enactment was codified at Sections 4241 through 4243. Pub. L. No. 80-772, 62 Stat. 855 (1948) (codified as amended at 18 U.S.C. §§ 4241-4243).[7] These sections provided respectively for (1) a board of examiners at each federal correctional institution to examine mentally ill inmates and report them to the Attorney General, who was then authorized to remove the inmate to a federal mental hospital (§ 4241), (2) transfer of recovered hospitalized inmates to a federal correctional institution following their recovery (§ 4242), and (3) transfer of non-recovered, released inmates from the federal hospital to "the proper authorities" where the inmate resided (§ 4243). This theme of desired state involvement permeates the history of -- and current law governing -- federal civil commitment.

The 1949 Enactment consisted of five sections contained in the Conference's draft legislation -- sections 4244 through 4248 -- which failed initially to secure Congressional approval. In September 1948, the Attorney General explained as follows:

> I was disappointed, as I know you were, because of the failure of enactment of the bill to provide for the care and custody of insane persons charged with

---

[7] As explained within, the codified §§ 4241 through 4248 correspond numerically, but not substantively, with their amended versions that followed decades later and remain in force presently.

or convicted of offenses against the United States. The Department of Justice has worked in close harmony with Judge [Calvert] Magruder and other members of his committee in behalf of this much needed legislation. The bill was actually passed by the Senate on June 10, 1948, and was referred to the Judiciary Committee of the House on the following day. It made no further progress toward enactment, however. Recommendations should be renewed at the next session of Congress for the speedy enactment of this bill.

Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 13 (Sept. 27, 1948) ("1948 Report"). The Judicial Conference again "reaffirmed its interest in [the] legislation . . . and approved the bill which passed the Senate (S. 850) on June 10, 1948." *Id.* at 41.

On September 7, 1949, Congress passed the 1949 Enactment. Pub. L. No. 81-285, 63 Stat. 686 (1949) (codified as amended at 18 U.S.C. § 4244-4248). The 1949 Enactment thus added §§ 4244 through 4248 to §§ 4241 through 4243 resulting from the 1948 Act.

The material portions of §§ 4246, 4247 and 4248 -- the root system from which the current § 4246 sprung -- are set out below:

[Former 18 U.S.C. § 4246] Whenever the trial court shall determine in accordance with sections 4244 and 4245 of this title that an accused is or was mentally incompetent, the court may commit the accused to the custody of the Attorney General or his authorized representative, until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law. And if the court after hearing as provided in the preceding sections 4244 and 4245 shall determine that the conditions specified in the following section 4247 exist, the commitment shall be governed by section 4248 as herein provided.

[Former 18 U.S.C. § 4247] Whenever the Director of the Bureau of Prisons shall certify that a prisoner whose sentence is about to expire has been examined by the board of examiners referred to in title 18, United States Code, section 4241, and that in the judgment of the Director and the board of examiners the prisoner is insane or mentally incompetent, and that if released he will probably endanger the safety of the officers, the property, or other interests of the United States, and that suitable arrangements for the custody

24

and care of the prisoner are not otherwise available, the Attorney General shall transmit the certificate to the clerk of the court for the district in which the prisoner is confined. Whereupon the court shall cause the prisoner to be examined by a qualified psychiatrist designated by the court and one selected by the prisoner, and shall, after notice, hold a hearing to determine whether the conditions specified above exist. At such hearing the designated psychiatrist or psychiatrists shall submit his or their reports, and the report of the board of examiners and other institutional records relating to the prisoner's mental condition shall be admissible in evidence. All of the psychiatrists and members of the board who have examined the prisoner may be called as witnesses, and be available for further questioning by the court and cross-examination by the prisoner or on behalf of the Government. At such hearing the court may in its discretion call any other witnesses for the prisoner. If upon such hearing the court shall determine that the conditions specified above exist, the court may commit the prisoner to the custody of the Attorney General, or his authorized representative.

[Former 18 U.S.C. § 4248] Whenever a person shall be committed pursuant to section 4247 of this title [addressing the situation of an inmate whose sentence was nearly expired], his commitment shall run until the sanity or mental competency of the person shall be restored or until the mental condition of the person is so improved that if he be released he will not endanger the safety of the officers, the property, or other interests of the United States, or until suitable arrangements have been made for the custody and care of the prisoner by the State of his residence, whichever event shall first occur. Whereupon the Attorney General or his authorized representative shall file with the court which made said commitment a certificate stating the termination of the commitment and the ground therefor . . . . The Attorney General or his authorized representative shall have authority at any time to transfer a prisoner committed to his custody under the authority of section 4246 or section 4247 hereof to the proper authorities of the State of his residence.

### D.    *Transinstitutionalization, the Shift to Dangerousness as the Criterion for Commitment and the Beginnings of Federal Civil Commitment Reform*

Following the federal lead represented by the NMHA, and later the 1963 Community Mental Health Act, Pub. L. No. 88-164, 77 Stat. 282 (1963), "most states changed their involuntary-commitment statutes to require that an individual be a danger to him or herself and/or to others, with varying evidentiary requirements, rendering

25

involuntary commitment considerably more difficult." Steven Raphael & Michael A. Stoll, *Assessing the Contribution of the Deinstitutionalization of the Mentally Ill to Growth in the U.S. Incarceration Rate*, 42 J. Legal Studs. 187, 191 (2013) (citations omitted). A troubling phenomenon developed in the decades that followed. Incarceration rates for the mentally ill increased markedly:

> Many factors have contributed to the modern mass incarceration of people with mental illness. A leading explanation is "transinstitutionalization": the downsizing and closure of state mental hospitals known as deinstitutionalization, coupled with patient reinstitutionalization in jails and prisons--in other words, shifting the mentally ill from one institution to another. There is clearly some truth to this explanation.

Fredrick E. Vars & Shelby B. Calambokidis, *From Hospitals to Prisons: A New Explanation*, 102 Cornell L. Rev. Online 101, 103–04 (2017); *see* Paul F. Stavis, *Why Prisons Are Brim-Full of the Mentally Ill: Is Their Incarceration a Solution or a Sign of Failure?*, 11 Geo. Mason U. Civ. Rts. L.J. 157, 157–58 (2000) ("During the last half of the twentieth century their essential needs for care and treatment have been deficient or in many cases, totally ignored. In this sense, 'transinstitutionalization' has become the inevitable subsequent phase of forty years of a policy known as 'deinstitutionalization,' *i.e.*, the massive, nationwide closing of psychiatric hospitals and discharging of their patients. The apparent inverse relationship between the availability of hospital treatment and the increasing population of mentally ill prisoners was noticed more than a half century ago.").

State mental institutions experienced a 71 percent decrease in patient population from 1965 to 1980. Joseph P. Morrissey & Howard H. Goldman, *Care and Treatment of*

26

*the Mentally Ill in the United States: Historical Developments and Reforms*, 484 Annals of the American Academy of Political and Social Science 12, 22 (1986). The authors additionally observed as follows:

> Tens of thousands ended up in rooming houses, foster homes, nursing homes, run-down hotels, and on the streets. The transfer of patients from the "back wards to the back alleys" led to widespread concerns that deinstitutionalization was a disaster and that the states had abdicated their responsibilities to the mentally ill.

*Id.*

These conditions may have been a catalyst for the eventual Congressional reform of the federal civil commitment process beginning in the 1970s and culminating in the enactment of the Comprehensive Crime Control Act of 1984. Pub. L. 98–473, 98 Stat. 1976 (Oct. 12, 1984) ("the 1984 CCCA"). As discussed within, the 1984 CCCA amended the 1948 and 1949 Enactments to (1) more fully address federal inmates afflicted with a mental illness and, for the first time, (2) create a process for their conditional discharge, outpatient treatment, monitoring, and potential re-institutionalization.

### E.   *Modernization of the Federal Civil Commitment Process from 1965 to 1983 and the 1984 CCCA*

The roots of the 1984 CCCA reach deep.[8] The 22-year saga leading to enactment began in 1966, when President Lyndon B. Johnson urged Congress to create a commission

---

[8] Much of the historical discussion that follows covers proceedings in the Senate leading to the 1984 CCCA. One author observes as follows:

> The [federal criminal] code reform movement did not receive the same degree of attention in the House of Representatives . . . [as] in the Senate. . . . The House Judiciary Committee had . . . less staff support . . . , more of an

(Continued)

to "modernize our criminal laws." Message from the President, 112 Cong. Rec. 5368, 5370 (1966). Congress acted swiftly, creating the National Commission on Reform of Criminal Laws ("Reform Commission"). An Act to Establish a National Commission on Reform of Federal Criminal Laws, Pub. L. No. 89-801, 80 Stat. 1516 (1966). Prior to the Reform Commission completing its work, the legislative foundations were already being laid for the 1984 CCCA with a three-page, January 16, 1969, proposal introduced by Senator Robert C. Byrd to deny bail to certain individuals charged with crimes of violence. S. 289, 91st Cong. (1969).

The first appearance of significant, proposed amendments to 18 U.S.C. §§ 4241 through 4248 came from Senators John McClellan, Sam Ervin, and Roman Hruska. S.1, 93rd Cong. (1973). Senate Bill 1 arrived on the heels of the study and hearings following the Reform Commission's 1971 report. The measure was the first effort to develop a modern federal civil commitment process for mentally ill inmates.

---

arms-length relationship with the [DOJ], . . . and . . . a recent history of following, rather than preceding, the Senate on criminal justice initiatives.

Ronald L. Gainer, *Federal Criminal Code Reform: Past and Future*, 2 Buff. Crim. L. Rev. 45, 124 (1998). Mr. Gainer was well positioned in the criminal code reform process. His article has been widely cited over the decades. *See*, *e.g.*, Jessica A. Roth, Rehaif v. United States: *Once Again, A Gun Case Makes Surprising Law*, 32 Fed. Sent. R. 23, 25 n.38 (2019); Kathleen F. Brickey, *Federal Criminal Code Reform: Hidden Costs, Illusory Benefits*, 2 Buff. Crim. L. Rev. 161, 189 (1998) (noting Mr. Gainer was "a senior official in the [DOJ] for many years [between 1963 to 1989], was heavily involved in criminal law reform and supervised the Department's effort to have a new federal criminal code enacted").

Missing from those proposed amendments, however, was the conditional discharge and revocation process now found in 18 U.S.C. § 4146(e) and (f). The prospect of "probation" for mentally ill inmates first appeared in a later bill introduced by Senators McClellan and Hruska. S. 1400, 93rd Cong. § 4224(e) (1973). The alternative sentence would have been available to the district court for individuals who developed a mental illness following their conviction and imprisonment in a federal correctional institution. *Id.* (providing that when a hospitalized and convicted defendant recovered from his mental illness, the district court would hold a hearing to determine whether the defendant's term of imprisonment should be reduced or, among other options, result in the defendant being placed "on probation pursuant to" the Bill's chapter dealing with a sentence of probation generally).

The magnitude of the wholesale criminal code reform, along with the Watergate controversy, slowed the legislative process throughout the mid-1970s. *See generally* Ronald L. Gainer, *Federal Criminal Code Reform: Past and Future*, 2 Buff. Crim. L. Rev. 45, 114 (1998) ("The Watergate issues diverted so much attention from the code reform effort, as well as from other subjects, that they eventually mooted ongoing consideration of the code.").

Later in the 1970s, however, a comprehensive reconstruction of the federal criminal code, and civil commitment reform, again gained steam. And toward the end of the decade, the conditional discharge and discharge scheme took shape, albeit from a very unlikely source, and in a very unlikely way. In sum, the process found its genesis and development

29

not in a congressional study, commission, or testimony by correctional or mental health experts; it was instead spearheaded by a single concerned and aggrieved citizen.

In May 1978, R. Dennis Bevans' brother James "was forced off the road and murdered brutally by a person who had been a mental patient in two facilities . . . and had . . . a history of mental problems." *Reform of the Federal Criminal Laws: Hearings on S. 1722 and S. 1723 Before the S. Comm. on the Judiciary*, 96th Cong. 10057-58 (1979) (statement of R. Dennis Bevans). Mr. Bevans was determined to push reforms that would forestall a recurrence of the tragedy his family suffered.

He became acquainted in early 1979 with a woman who lived down the hall in his apartment building. She worked for Senator Theodore "Ted" Kennedy, then-Chairman of the Senate Committee on the Judiciary ("Judiciary Committee"). R. Dennis Bevans, *Fast Track Bureaucrat* 371 (2008). The acquaintance told Mr. Bevans whom he should contact in Senator Kennedy's office. *Id.* On February 1, 1979, Mr. Bevans wrote Senator Kennedy and described the tragic May 9, 1978, event involving his brother. *Reform of the Federal Criminal Laws: Hearings on S. 1722 and S. 1723 Before the S. Comm. on the Judiciary*, 96th Cong. 10067-68 (1979) (letter from R. Dennis Bevans to Hon. Edward M. Kennedy). The perpetrator, Gerald Fox, had been previously hospitalized pending his competency restoration. *Id.* at 10067. He was ultimately deemed not criminally responsible in view of his mental illness. *Id.*

While remarkably sympathetic to Mr. Fox's condition, Mr. Bevans simultaneously decried the fact that no "[p]ost release supervision" existed in federal law for individuals like Mr. Fox. *Id.* He noted additionally in the letter:

30

> [Mr.] Fox had been diagnosed as a paranoid schizophrenic with homicidal and suicidal tendencies . . . and had been institutionalized twice. Only two months prior to the murder of my brother, he had left a mental institution, promising to take the tranquilizing drugs that keep his condition stable. Instead, he promptly discontinued taking the drugs, and his condition progressively worsened. The evening before the murder (May 8, 1978), he blew a hole in the wall of his apartment with a shotgun--but no one was around to report it. Obviously, if Fox had been required to report regularly for observation (under penalty of being picked up by the police and returned to the institution) my brother would still be alive, and his three children would have their father.

*Id.* at 10067-68.

Months later, on September 9, 1979, Senators Kennedy, Strom Thurmond, Orrin Hatch, Dennis DeConcini, and Alan Simpson introduced Senate Bill 1722, entitled the "Criminal Code Reform Act of 1979" ("1979 CCCA"). The 1979 CCCA contained provisions materially identical to those in the preceding years dealing with hospitalized inmates due for release but suffering from a mental disease or defect. S. 1722 (Sept. 7, 1979). When referred that same month to the Judiciary Committee, the Bill yet lacked the conditional discharge and revocation scheme urged by Mr. Bevans. Following his letter to Senator Kennedy, however, and after further explaining his views to a Judiciary Committee staff member, Mr. Bevans was scheduled to testify; remarkably, Judiciary Committee staff asked for his written legislative proposal. Bevans, *supra*, at 371. He then "decided to write . . . [a] version of a man from the moon draft law that simply made sense of an unreasonable, uncontrolled, and dangerous situation." *Id.*

On September 18, 1979, approximately ten days after Senate Bill 1722 was introduced, Senator Thurmond, then the ranking minority member of the Judiciary Committee, called Mr. Bevans to testify; Committee Counsel Paul Summitt was in

31

attendance. *Reform of the Federal Criminal Laws: Hearings on S. 1722 and S. 1723 Before the S. Comm. on the Judiciary*, 96th Cong. 10057-58 (1979) (statement of R. Dennis Bevans). Mr. Bevans testified, in part, as follows:

> I am proposing that the bill you are considering be expanded to provide for mandatory post-release supervision of individuals such as those who have murdered and then are involuntarily committed to a mental facility.

> I am suggesting that in the current situation, legislation treats the topic of mental illness in two ways; No. 1, it provides procedurally for the person who is determined to have been temporarily insane and is expected to recover, and No. 2, for the person who is chronically mentally ill, but able to be discharged from a mental hospital with an adequate margin of safety for society, given the history of the patient and the diagnosis regarding the type of mental illness.

> This adequate margin of safety may include the voluntary taking of medications for emotional stability, or counseling, or both.

> . . . .

> What is needed is the discretion for doctors or judges to require, as a condition of release, that persons they consider potentially dangerous when not on some form of medication, counseling or both, be required to report routinely for the treatment they need to insure continued emotional stability.

> I believe that Gerald Fox, the murderer, was sick, hallucinating, and socially dysfunctional when he murdered my brother. I believe in the procedures and the system that judged and confined him. I am alarmed and horrified at the system and procedures that may release him without supervision into our society once again someday . . . and are governing the release of others right now.

> We, the families of the victims of violent crime, have tended to live quietly within society with our private thoughts, grief, and individual accommodation to what has happened. But, as our numbers grow, so does our need to speak out against a system of laws, or lack of them, that permits the type of horror story that we live with as a family every day.

> *If you permit my proposed formal language to appear in this bill*, that will be a dramatic first step for the States to follow. Not only will it govern .

. . Federal crimes along these lines, but it will give the State legislators, many of whom I have talked to, language to deal with, and the feeling that the feds recognize the problem and are intending to do something about it.

*Reform of the Federal Criminal Laws: Hearings on S. 1722 and S. 1723 Before the S. Comm. on the Judiciary*, 96th Cong. 10057-58, 10061 (1979) (statement of R. Dennis Bevans) (emphasis added). At the conclusion of Mr. Bevans' testimony, Senator Thurmond responded, "[v]ery fine" and engaged in a colloquy concluding with his statement, "I feel that what you have said will result in the most careful consideration and some action being taken." *Id.*

Accompanied by an extraordinary 1,519-page Report, the Judiciary Committee transmitted an amended version of Senate Bill 1722 ("1980 Markup") to the Senate on January 17, 1980. *See*, *e.g.,* Criminal Code Reform Act of 1979, Report of the Committee on the Judiciary, United States Senate, S. Rep. No. 96-553 1115 (1980) ("1980 Report"). The 1980 Markup and Report, respectively, included two matters of interest presently. First, the 1980 Markup added proposed subsection 3616(f) to Senate Bill 1722, the conditional discharge and revocation process urged by Mr. Bevans. This was the first step toward the conditional discharge and revocation process that emerged years later in the 1984 CCCA and the current version of § 4246(f).[9] Second, the 1980 Report dispels any

---

[9] The Judiciary Committee generally credited Mr. Bevans with the conditional discharge and revocation process that ultimately became law. 1980 Report at 1114 n. 48 ("The provisions in this section and section 3616 to permit a court to release a person on condition that he conform to a prescribed regimen of medical care or treatment was persuasively recommended by R. Dennis Bevans whose family experienced a tragedy that this provision, if available in the jurisdiction in which the incident occurred, might have been prevented.").
(Continued)

notion that the proof standards (and lack thereof) in what ultimately became § 4246 were the product of haste or oversight. The 1980 Report demonstrates the Judiciary Committee focused intensely upon proof standards generally.

For example, the 1980 Report at page 1115 includes the following observation regarding the related statutory process for hospitalization of a person acquitted by reason of insanity: "It should be noted that the standard used for determining recovery -- and thus release -- by a preponderance of the evidence -- is intentionally lower than the standard for commitment -- upon clear and convincing evidence." *See*, *e.g.*, Criminal Code Reform Act of 1979, Report of the Committee on the Judiciary United States Senate, S. Rep. No. 96-553 1115 (1980). And in the 1980 Report at page 1123 dealing with the § 3616 (now § 4246) subject of "Hospitalization of a person due for release but suffering from a mental disease or defect," and the proof standards there found, the following language appears: "These provisions are similar to those . . . dealing with persons acquitted by reason of insanity, *and the discussion there should be consulted here*." *Id.* at 1123 (emphasis added). The emphasized language removes any doubt respecting the Judiciary Committee's careful construction of the statutory provision that became § 4246.

---

Also, as discussed more fully within, the only differences between the subsection 3616(f) added via the 1980 Markup, and the current version of § 4246(f), are (1) the addition of the words "psychiatric or psychological" immediately following each instance where the word "medical" appears, and (2) the removal of the word "serious" prior to the words "bodily injury."

34

Immediately following that clarification in the 1980 Report is a brief discussion of the newly proposed conditional discharge process advocated by Mr. Bevans, quoting from his suggested language, and offering other pertinent information:

> Subsection (f) provides a procedure for dealing with the situation in which the released person fails to comply with the prescribed regimen of medical care or treatment. Under this procedure the director of the medical facility responsible for administering the regimen imposed under subsection (e) shall notify the Attorney General and the court having jurisdiction over the case of the failure to comply with the prescribed regimen. *In a procedure similar to revocation of probation*, upon notice by the medical director or other probable cause to believe the person has failed to comply with the regimen, the person may be arrested and, upon arrest, must be brought without unnecessary delay before the court having jurisdiction. The court must, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical care or treatment, his continued release would create a substantial risk of serious bodily injury to another person or serious damage to property of another.

*Id.* 1123-24 (emphasis added).

The 1980 Report, like the 1980 Markup, thus makes no mention of a proof standard governing the revocation component of the conditional discharge scheme. As indicated by the emphasized language immediately above, however, the Judiciary Committee compared the contemplated conditional discharge revocation process to the then-existing procedure for "revocation of probation." *Id.* That observation is noteworthy, inasmuch as the 1980 Markup also included § 2105 within Senate Bill 1722; § 2105 dealt with "Revocation of Probation." 1980 Markup at 180. The proposed process for probation revocation also omitted a proof standard; that standard remains unstated in the current probation revocation

35

scheme found in 18 U.S.C. § 3565(a) and *Federal Rule of Criminal Procedure* 32.1.[10]

Additionally, § 2303 of Senate Bill 1722 dealt with another form of judicial supervision. It included the new option for supervised release following imprisonment. Section 2303 provided no revocation option at all, much less a governing proof standard. At this point in the legislative process, then, all three proposed, major forms of judicial supervision lacked any proof standard for adjudicating violations of the conditions imposed.

Despite the immense work devoted to it, Senate Bill 1722 did not receive a vote.[11] Just over a year later, however, on March 30, 1981, a seismic development occurred. President Ronald W. Reagan was the victim of an attempted assassination by John

---

[10] There is another noteworthy indication in the Markup respecting the standard of proof for conditional discharge revocation under 4246(f). Section 3615 of Senate Bill 1722 -- dealing with hospitalization of an imprisoned person suffering from a mental disease or defect -- is followed immediately by the § 3616 scheme that includes revocation of conditional discharge. These two proposed statutes ultimately became, respectively, 18 U.S.C. §§ 4245 and 4246. The Markup reflects the Judiciary Committee changed the omitted proof standard in § 3615(d) by adopting a preponderance standard:

> (d) DETERMINATION AND DISPOSITION.—If, after the hearing, the court ~~is of the opinion~~ *finds by a preponderance of the evidence* that the defendant is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the defendant to the custody of the Attorney General.

S. 1722 (Jan. 17, 1980) (emphasis added). As noted, however, it recommended no similar alterations in § 3616. This is one more indication the absence of a proof standard in § 4246(f) was not the product of oversight.

[11] The proposed criminal code reform legislation thus went the way of its predecessor and successor bills until 1983. *See* 119 Cong. Rec. 989-1018 (1973); 121 Cong. Rec. 121, 215-20 (1975); 123 Cong. Rec. 13059, 13061 (1977); 127 Cong. Rec. 29025 (1981).

Hinckley, Jr., who was ultimately found not guilty by reason of insanity. The verdict produced "stunned surprise" and a "cascade of public outrage." Russell D. Covey, *Criminal Madness: Cultural Iconography and Insanity*, 61 Stan. L. Rev. 1375, 1418 n.20 (2009) (quoting Richard J. Bonnie *et al.*, A Case Study in the Insanity Defense: The Trial of John W. Hinckley, Jr., 121 (3d ed. 2008) (quoting Stuart Taylor, Jr., *The Hinckley Riddle*, N.Y. Times, June 24, 1982, at D21)).

The Honorable Barrington D. Parker presided at Mr. Hinckley's trial. He observed the unprecedented impact of the attempted assassination and the verdict that followed:

> After several days of careful deliberation, the jurors concluded that they had a reasonable doubt as to Hinckley's mental state at the time of the assassination attempt; therefore, he should not be held criminally responsible for the crimes charged in the indictment.
>
> In view of the public outrage over the verdict, together with the charged political and social climate of the time, it was not surprising that the insanity plea was the immediate target of relentless attacks from all sources. For many, the defense was a clear manifestation of the failure of our criminal justice system to punish individuals who clearly violated the law.
>
> In the wake of *Hinckley*, the Senate and House Judiciary Committees of the Congress scheduled hearings and considered weeks of diverse testimony from highly qualified experts with varied experiences.

*See* Rita J. Simon & David E. Aaronson, *The Insanity Defense: A Critical Assessment of Law and Policy in the Post-Hinckley Era* viii (1988).

The attempted assassination and disposition provided the necessary catalyst for a historic reform of the federal criminal code, with particular attention to how the federal sovereign would treat the intersection between mental illness and criminal misconduct. Monica Trucco, *Juvenile Justice? Federal Involuntary Commitment and the Underlying*

*Policy: A Case Comment on* United States v. S.A., 26 New Eng. J. on Crim. & Civ. Confinement 193, 205 (2000) ("The principal reason for the reformation of the federal law dealing with mental illness was the 1981 attempted assassination of President Ronald Reagan by John Hinckley.").

On January 26, 1983, just months following the June 21, 1982, Hinckley verdict, Senator Thurmond addressed his colleagues on the Senate floor: "Mr. President, today I am introducing a bill to define the affirmative defense of insanity *and to establish uniform and comprehensive procedures for the civil commitment of Federal offenders suffering from a mental disease or defect*." 129 Cong. Rec. 661 (daily ed. Jan. 26, 1983) (emphasis added) (statement of Senator Strom Thurmond). Senator Thurmond simultaneously added to the record a "Section-by-Section Analysis" of his Senate Bill 105, providing pertinently that "[s]ubsection (f) [of the proposed 18 U.S.C. § 4246] permits revocation of a conditional release order if such a risk is created anew by the person's failure to comply with the conditions of release." *Id.* at 664.

A few months later, on March 16, 1983, President Reagan transmitted a proposed comprehensive criminal code reform package to Congress, placing the long-studied project before Congress once again. Message from the President Transmitting "A Proposal for Legislation Entitled the Comprehensive Crime Control Act of 1983," H.R. Doc. No. 98-32 (1983). Senator Thurmond's bill and President Reagan's package resulted in Senators Kennedy, Thurmond, Paul Laxalt, and Joseph R. Biden, Jr., introducing a bipartisan, omnibus anticrime package in the form of Senate Bill 1762, which was then referred to the Judiciary Committee.

38

Senate Bill 1762 contained most of President Reagan's proposals and also the Insanity Defense Reform Act, which included the proposed § 4246 that previously was enumerated § 3616 in the 1980 Markup of Senate Bill 1722. *Major Crime Package Cleared by Congress*, in CQ Press Library, CQ Almanac 215 (1985), *available in* CQ Press Library, CQ Almanac, http://library.cqpress.com/cqalmanac/cqal84-1152527 (last visited Sept. 4, 2022). Document ID: cqal84-1152527 ("*Almanac*").

One commentator who has intensively studied the Senate committee process for decades -- focusing in particular on the period when the 1984 CCCA was enacted -- noted the unusual, bipartisan history surrounding criminal law reform during the period:

> The version of the bill brought into markup in 1983 contained an array of provisions that had been before the committee in previous years, ranging from bail and sentencing reform to measures relating to drug penalties and the insanity defense. Before hearings were held, [Senator] Thurmond and then subcommittee chair [Senator] Paul Laxalt planned to include in the legislation highly controversial provisions relating to capital punishment, habeas corpus, and the exclusionary rule. With these items included, many Democrats intended to fight the legislation.
>
> In response, [then-Senator] Biden proposed that the more controversial provisions be removed and *considered as separate pieces of legislation*. A Republican staffer included in the negotiations described the process.
>
>> During the hearings, [Senators] Biden and Kennedy said there were a lot of good parts to the bill and asked why it was burdened with controversial sections.
>>
>> What we got was the deal that we would take out of the package those sections that the Democrats didn't like and construct a new package, with [Senators] Thurmond, Biden, Laxalt, and Kennedy as cosponsors. They would . . . act in union. If any one of those four objected to an amendment in committee, all four would line up in support. It was a veto power.

This alliance between [Senators] Strom Thurmond, Joseph Biden, Paul Laxalt, and Edward Kennedy was crucial to timely Senate action on the legislation . . . .

*[Senators] Thurmond and Biden were able to coalesce by striking the more divisive provisions from the package, and uniting behind more consensual ones . . . .*

C. Lawrence Evans, *Leadership in Committee: A Comparative Analysis of Leadership Behavior in the U.S. Senate* 115-17 (2001) (emphasis added).

On September 14, 1983, the Judiciary Committee produced another lengthy document, similar to the 1980 Report, concerning Senate Bill 1762. *See* Comprehensive Crime Control Act of 1983, Report of the Committee on the Judiciary United States Senate, S. Rep. No. 98-225 (1983) ("1983 Report"). A comparison of the heretofore-quoted portion of the 1980 Report provisions on then-subsection 3616(f) and the 1983 Report on the proposed § 4246(f) reveals only one change, namely, the word "serious" preceding "bodily injury" is omitted in the 1983 Report. *Compare* 1980 Report at 1123-24, *with* 1983 Report at 253. Further, the Judiciary Committee comparison of revocation of conditional discharge to "revocation of probation" remained intact. *Compare* 1980 Report at 1123-24, *with* 1983 Report at 253. Interestingly, however, the new sentencing option of supervised release reflected in Senate Bill 1762 and the 1983 Report accompanying it still contemplated no revocation scheme. The 1983 Report instead observed as follows:

*The term of supervised release is very similar to a term of probation*, except that it follows a term of imprisonment and may not be imposed for purposes of punishment or incapacitation since those purposes will have been served to the extent necessary by the term of imprisonment. *Unlike a term of probation, however, the term of supervised release is not subject to revocation for a violation.* Instead, for the usual violations, the term or conditons [sic] of supervised release may be amended pursuant to subsection

40

(e). If the violation is a new offense, the defendant may, of course, be prosecuted for the offense *or held in contempt of court for violations of the court order setting the conditions of supervised release*. The Committee did not provide for revocation proceedings for violation of a condition of supervised release because it does not believe that a minor violation of a condition of supervised release should result in resentencing of the defendant and because it believes that a more serious violation should be dealt with as a new offense.

1983 Report at 125 (emphasis added); *see* Senate Bill 1762 at 165 ("The court may, after considering . . . [certain] factors . . . (3) treat a violation of a condition of a term of supervised release as contempt of court pursuant to section 401(3) of this title.").

While some of the heretofore-quoted language from the 1980 Report respecting the burdens and standards of proof does not appear in the 1983 Report, those standards are still prominently discussed at various points throughout the latter, including the discussion of reforms to the insanity defense and the civil commitment process. *See, e.g.*, 1983 Report at 225 ("Thus, it is clear that the question of which party -- the government or the defendant -- should bear the burden of proof on the insanity defense, as well as the appropriate standard, are not of constitutional dimensions beyond the power of Congress to legislate."); *id.* at 229 ("More than half of the States now place the burden of proving insanity on the defendant, albeit often by a preponderance of the evidence standard. As previously noted, the Supreme Court . . . has made it clear that placing this burden of proof on the defendant under a standard of clear and convincing evidence is constitutionally permissible."); *id.* at 230; *id.* at 236 ("Subsection (d) of section 4241 provides that the court must make a determination with respect to the defendant's competency based upon a preponderance of the evidence."); *id.* at 237; *id.* at 238; *id.* at 240 n.58; *id.* at 242-43; *id.* at 246; *id.* at 249.

41

One such reference to "preponderance of the evidence" is found in the 1983 Report on the page immediately preceding discussion of subsection § 4246(f). *Id.* at 252. Again, these many references to standards of proof, some in close proximity to the 1983 Report discussion of the proposed, revised § 4246(f), by this point appear to conclusively foreclose any notion that Congress mistakenly omitted a governing proof standard for revocation of conditional discharge; it instead appears the omission was entirely purposeful.

Ultimately, the material provisions of the proposed § 4246 contained in Senate Bill 105 originally introduced by Senator Thurmond in January 1983 were included in Senate Bill 1762. And, in particular, subsection 4246(f) of Senate Bill 105 emerged entirely unscathed after its inclusion in Senate Bill 1762. *Compare* 18 U.S.C. § 4246(f), *with* 129 Cong. Rec. S667 (daily ed. Jan. 26, 1983).

On February 2, 1984, Senate Bill 1762 passed by a 91-1 margin. *Almanac* at 215. The proceedings thereafter in both the House of Representatives and in conference follow:

> On Sept. 25, House Republicans employed an end run to get the Senate crime bill passed. Rep. Dan Lungren, R-Calif. a Judiciary Committee member, made a motion to send the "must-pass" fiscal 1985 continuing appropriations resolution (HJ Res 648) back to the Appropriations Committee with instructions to attach a House bill (HR 5963) identical to the Senate crime package and return the measure to the full House.
>
> Lungren's motion was agreed to 243-166, with 89 Democrats joining 154 Republicans in supporting the maneuver. . . .
>
> The funding bill, with the crime package attached, promptly returned to the House floor and was passed the same day, 316-91. . . .
>
> On Oct. 2, House Democrats countered by consolidating various Judiciary Committee proposals into one bill (HR 5690) and proposing it for passage under suspension of the rules, which requires a two-thirds majority. The bill passed 406-16. . . .

42

> When the funding bill (HJ Res 648) got to the Senate, members decided to retain the crime provisions, even though most other riders were eventually stripped from the measure. . . .
>
> The Senate decision assured that major crime legislation would be enacted in 1984. And the House Democrats' Oct. 2 move to pass their own bill [(HR 5690)] did have some effect on the final product. When appropriations conferees met Oct. 10, they called in House and Senate Judiciary members to advise them on the crime section of HJ Res 648.
>
> During a lengthy and somewhat testy meeting, a final compromise crime package was worked out.

*Almanac* at 215.

At least one element of the compromise is noteworthy. Title II of House of Representatives Bill 5690 dealt with the "Insanity Defense." H.R. 5690, 98th Cong. Title II 28 (1984). The Bill included a civil commitment provision of its own, along with a conditional discharge scheme at § 4175. The revocation hearing for those who violated their conditional discharge was prescribed in § 4175(f) as follows:

> Following such [revocation] hearing, the court—
>
>> (1) shall recommit the person under section 4174 of this title if the court finds *by a preponderance of the evidence* that the likelihood that the person will commit acts of serious bodily injury to any person or substantial damage to the property of another is sufficient to justify commitment . . . .

*Id.* at 64 (emphasis added). The proposed preponderance standard in House of Representatives Bill 5690 died in Conference on October 10, 1984; instead, the Senate -- and the current -- version of conditional discharge and revocation found in § 4246(f) was included in the proposed 1984 CCCA, which was, in turn, then added to House Joint Resolution 648, the appropriations bill for Fiscal Year 1985.

43

With President Reagan's signature on October 12, 1984, the 1984 CCCA, Pub. L. No. 98-473, 98 Stat. 1976, as Title II of a Continuing Appropriations Act for Fiscal Year 1985, became law. Continuing Appropriations, 1985 -- Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182. One commentator described the 1984 CCCA as "a series of sweeping changes" and "'the most significant series of changes in the federal criminal justice system ever enacted at one time.'" Rachel E. Barkow, *Categorical Mistakes: The Flawed Framework of the Armed Career Criminal Act and Mandatory Minimum Sentencing*, 133 Harv. L. Rev. 200, 210 (2019) (quoting Joseph E. diGenova & Constance L. Belfiore, *An Overview of the Comprehensive Crime Control Act of 1984 -- The Prosecutor's Perspective*, 22 Am. Crim. L. Rev. 707, 707 (1985)); *see also* S. Rep. 98-225, at 1, *as reprinted* in 1984 U.S.C.C.A.N. 3182, 3184 ("The Comprehensive Crime Control Act . . . is the product of a decade long bipartisan effort of the Senate Committee on the Judiciary, with the cooperation and support of successive administrations, to make major comprehensive improvements to the federal criminal laws. Significant parts of the measure, such as . . . insanity defense amendments . . . have evolved over the almost two-decade consideration of proposals to enact a modern federal criminal code.").

As a result of the bulk of Senate Bill 1762 finding its way into the 1984 CCCA, neither (1) the newly amended § 3565(a)(2) or *Federal Rule of Criminal Procedure* 32.1 dealing with probation revocation, nor (2) the newly added § 4246(f) dealing with revocation of conditional discharge, contained a proof standard governing the judicial decision. Additionally, respecting the entirely new sentencing option of supervised release,

44

revocation under § 3583(e)(3) was not even an option. The district court was limited to entering a contempt sanction, again with no textual proof standard imposed.[12]

With this extended historical context, we now turn to the two questions presented.

## V.

### *A.      The Proof Standard for § 4246(f)*

**1. Textual Analysis**

The Supreme Court has consistently reiterated our interpretive task begins with the statutory text:

> Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto). As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text. The Court may not "replace the actual text with speculation as to Congress' intent."

*Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496–97 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)); *id.* (noting further "the legislature says what it means and means what it says") (quoting *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (internal quotation marks and alterations omitted). We have emphasized the same approach: "'As with all cases involving statutory interpretation, we begin our analysis with the text of the governing statute.'" *United States v. Perez*, 22 F.4th 430, 436 (4th Cir. 2022) (quoting *United States v. Muhammad*, 16 F.4th 126, 128 (4th Cir. 2021)).

---

[12] Section 3583 was amended on October 27, 1986. Anti-Drug Abuse Act of 1986, Pub. L. 99–570, 100 Stat. 3207 § 1006 (Oct. 27, 1986). The amendment required a finding "by a preponderance of the evidence" that the supervisee violated her conditions. *Id.*

That task is straightforward with § 4246(f); as noted, Congress inserted no proof standard. To the extent necessary, that conclusion is fortified by Congress inserting two other proof standards elsewhere in § 4246. It is quite tempting to read in a proof standard where none exists. One might base that addition upon the legislative history, common sense, reason, supposition, or simply a desire to guide the district court's discretion or aid our review. Regardless of the motivation, that perhaps well-meaning approach inevitably smacks of an ill-advised judicial amendment. That is especially the case given -- as more fully discussed in the next section -- the obvious care taken with § 4246 during the legislative process, which spanned years. We are thus left with no textual proof standard in § 4246(f).

## 2. Confirmation by Legislative History

While resort to legislative history is unnecessary, we have occasionally examined it to confirm the textual analysis. *In re Eli Lilly & Co.*, 37 F.4th 160, 165 (4th Cir. 2022) ("This textual conclusion is confirmed by legislative history, although any reference to legislative history in these circumstances might be gratuitous."); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) ("The extensive legislative history accompanying the TCPA confirms its broad reach."); *Hately v. Watts*, 917 F.3d 770, 785 (4th Cir. 2019) ("The plain language of this definition encompasses email. And the legislative history confirms that Congress intended this definition to encompass email.").

From the moment § 4246(f) was drawn by the Judiciary Committee in 1979, and then transmitted to the full Senate in the 1980 Markup, it contained no proof standard. And, as noted, the language of that subsection remained materially static from its inception in

the 1980 Markup through its incorporation into the 1984 CCCA. Within that time period, the leadership of both the Senate and the Judiciary Committee changed hands in 1981. Despite that rather tectonic political shift, both men who chaired the Judiciary Committee during the relevant periods -- Senator Kennedy through 1980 and Senator Thurmond thereafter through the enactment of the 1984 CCCA -- supported the proposed statutory language found in § 4246(f).

Further, as earlier noted, the 1980 and 1983 Reports -- not to mention the various Senate Bills earlier discussed -- were replete with references to proof standards, some of which were found, and remain, in § 4246 presently. Indeed, as noted *supra*, the 1980 Markup added a proof standard (preponderance of the evidence) to the proposed statutory section that ultimately became § 4245, immediately preceding the statutory section that became § 4246. The absence of a § 4246(f) proof standard was a legislative choice.

Were that an open question, however, all doubt is dispelled by what occurred during Conference on the 1984 CCCA. As the discussion in Part IV.E demonstrates, within the civil commitment process in Title II of House of Representatives Bill 5690 dealing with the "Insanity Defense," H.R. 5609, 98th Cong. Title II 28 (1984), one who would have been federally committed and then conditionally released under proposed Chapter 310, § 4175, was subject to recommitment if the court found "by a *preponderance of the evidence* that the likelihood that the person will commit acts of serious bodily injury to any person or substantial damage to the property of another is sufficient to justify commitment." *Id.* at 64 (emphasis added). The striking of that provision during

47

Conference, substituting for it the Senate Bill 1762 version of § 4246(f) containing no proof standard, is a drafting event of significant moment:

> "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also Muniz v. Hoffman*, 422 U.S. 454, 468 (1975) (explaining that statutory text "may not be read isolated from its legislative history and the revision process from which it emerged, all of which place definite limitations on the latitude we have in construing it.").

*Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 927 (4th Cir. 2022).

The legislative history thus abundantly confirms that there is no textual proof standard in § 4246(f). Leaving the matter there, however, is unacceptable. It is one thing to find a textual proof standard unstated and quite another to assume no proof standard was intended at all. Whether the absence of a governing textual proof standard results in a latent ambiguity or, alternatively, the plain meaning of the statute nevertheless produces an "absurdity . . . or an outcome that is demonstrably at odds with clearly expressed congressional intent," we are obliged to probe more deeply. *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004). That is especially the case where, as here, a missing or misunderstood proof standard might cause either (1) the mistaken deprivation of one's liberty, or (2) an errant release of one bent on causing catastrophic harm.

A broader textual and contextual analysis of the 1984 CCCA is thus warranted, using our customary canons. Of immediate interest is the two-fold consideration that (1) the 1980 and 1983 Reports analogized conditional discharge and revocation to probation, and (2) both of those forms of judicial supervision found in the 1984 CCCA lack a proof

48

standard. In view of the parallels between these two forms of judicial supervision -- one brand new and one in existence for decades -- the well-developed probation revocation model may have influenced Congress' approach under § 4246(f). An analysis of the probation imposition and revocation process in place on the eve of the 1984 CCCA may thus inform the proper interpretation of § 4246(f).

### 3. The Probation Analogy

As noted, when the 1984 CCCA was enacted, it not only created the entirely new process for conditional discharge and revocation under § 4246(f), but also modified the longstanding process for imposing and revoking probation.

Unlike the conditional discharge and revocation process, however, probation was an authorized sentence long predating enactment of the 1984 CCCA. It is thus not only helpful to consider how the probation revocation process worked in the decades preceding the 1984 CCCA—it is an essential part of the construction process:

> As a matter of statutory construction, federal courts "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corporation v. Miller*, 486 U.S. 174, 184–85 (1988); *see also Strawn v. AT&T Mobility, LLC*, 530 F.3d 293, 297 (4th Cir. 2008) (recognizing that "in the absence of statutory text reversing the burden of proof, we presume that Congress legislated consistently with existing law"); *United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) (en banc) (explaining that "it is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law; that is with the knowledge of the interpretation that courts have given to an existing statute") (referencing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68 (1992)). Accordingly, "'absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.'" *Id.* (quoting *Est. of Wood v. Comm'r*, 909 F.2d 1155, 1160 (8th Cir. 1990).

49

*Pugin v. Garland*, 19 F.4th 437, 458–59 (4th Cir. 2021) (Gregory, C.J., dissenting); *see also United States v. Cong. of Indus. Organizations*, 335 U.S. 106, 112 (1948) ("There is no better key to a difficult problem of statutory construction than the law from which the challenged statute emerged."); *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 335 (4th Cir. 2008) ("[W]e presume that Congress legislated consistently with existing law and with the knowledge of the interpretation that courts have given to the existing statute.").

With President Calvin Coolidge's signature on March 4, 1925, the United States first authorized a sentence of probation. An Act to Provide for the Establishment of a Probation System in the United States Courts, Except in the District of Columbia, ch. 521, 43 Stat. 1259 (1925). The very first revocation provisions read as follows:

> At any time after the probation period, but within the maximum period for which the defendant might originally have been sentenced, the court may issue a warrant and cause the defendant to be arrested and brought before the court. Thereupon the court may revoke the probation or the suspension of sentence, and may impose any sentence which might originally have been imposed.

*Id.* at 1260. No proof standard appears. The statutory language changed very little until a May 24, 1949, amendment modified the revocation language to read as follows:

> As speedily as possible after arrest the probationer shall be taken before the court for the district having jurisdiction over him. Thereupon the court may revoke the probation and require him to serve the sentence imposed, or any lesser sentence, and, if imposition of sentence was suspended, may impose any sentence which might originally have been imposed.

Probation, ch. 139, 63 Stat. 96 (1949). Again, no proof standard appears. This version of the revocation provision remained intact until enactment of the 1984 CCCA. In sum, for the 59 years preceding the 1984 CCCA, Congress found it unnecessary to insert a proof

standard into its probation revocation scheme. It instead stood silent on the matter, even

after the watershed decision in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), that essentially

rewrote the due process protections attendant to the probation revocation process. *Id.* at

782 ("Probation revocation, like parole revocation, is not a stage of a criminal prosecution,

but does result in a loss of liberty. Accordingly, we hold that a probationer, like a parolee,

is entitled to a preliminary and a final revocation hearing, under the conditions specified in

*Morrissey v. Brewer*[, 408 U.S. 471 (1972).]"). And when Congress reworked the

probation process entirely in the 1984 CCCA, it likewise inserted no proof standard. And,

as earlier noted, there is presently no textual proof standard for probation revocations.

In accord with *Goodyear* and its progeny, we examine the probation revocation

proof standard(s) against which Congress legislated in 1984. At that time, the Circuits were

split respecting two different proof standards guiding a district court's discretionary

decision on probation revocation:

> Standards for proof in such proceedings did emerge, however, through
> judicial review of revocation decisions. . . . Alternatively, the court may look
> to see if the "evidence and facts be such as to *reasonably satisfy* the judge
> that the conduct of the probationer has not been as good as required by the
> conditions of probation." A number of recent decisions have found the
> *"reasonably satisfy" test* to be adequate even under the due process mandate
> of *Morrissey*.

> A small minority of courts had required *a preponderance of the
> evidence* as a basis for revocation of probation or parole even prior to
> *Morrissey*. Subsequent to *Morrissey*, a number of state courts also held that
> such a standard of proof is required to satisfy due process. No court has held,
> and a number of courts have expressly rejected, the contention that a
> violation need be proved beyond a reasonable doubt.

51

William C. Bowers, Comment, *Does Due Process Require Clear and Convincing Proof Before Life's Liberties May Be Lost?*, 24 Emory L.J. 105, 123–24 (1975) (emphasis added) (footnotes omitted) ("The vast majority of state statutes, as well as the federal parole and probation statutes, contain no direction as to the necessary burden of proof.") (footnotes omitted).

The majority approach appears to have resulted from *Burns v. United States*, 287 U.S. 216 (1932). The decision in *Burns* observed as follows:

> There is no suggestion in [the Federal Probation Act] that the scope of the discretion conferred for the purpose of making the grant [of probation] is narrowed in providing for its modification or revocation . . . . The question in both cases is whether the court *is satisfied* that its action will subserve the ends of justice and the best interests of both the public and the defendant.

*Id.* at 221 (emphasis added). Based upon the *Burns* decision, as noted by the commentator, nearly all circuits prior to the 1984 CCCA adopted the "reasonable satisfaction" test. *See, e.g.*, *United States v. Smith*, 571 F.2d 370, 372 (7th Cir. 1978) (holding that the Court would "adhere to the rule that a district court may revoke probation when 'reasonably satisfied' that the probationer ha[d] violated a condition of his probation"); *United States v. Strada*, 503 F.2d 1081, 1085 (8th Cir. 1974) (holding that "the trial judge is given a great deal of latitude in revocation proceedings. In order to justify a revocation order 'all that is required is enough evidence, within a sound judicial discretion, to satisfy the district judge that the conduct of the probationer has not met the conditions of his probation'" (cleaned up)); *United States v. Garza*, 484 F.2d 88, 89 (5th Cir. 1973) (holding that "[a] revocation of probation does not require proof sufficient to sustain a criminal conviction. All that is required is enough evidence, within a sound judicial discretion, to satisfy the district judge

52

that the conduct of the probationer has not met the conditions of the probation"); *United States v. Carrion*, 457 F.2d 808, 809 (9th Cir. 1972) (holding that "[p]robation may be revoked when the judge is reasonably satisfied that a state of federal law has been violated, and conviction is not a prerequisite"); *United States v. D'Amato*, 429 F.2d 1284, 1286 (3d Cir. 1970) (holding that "[t]he district judge need only be reasonably satisfied that the terms of the probation have been violated" to revoke probation); *United States v. Nagelberg*, 413 F.2d 708, 709 (2d Cir. 1969) (holding that "[o]n a hearing to revoke probation, all that is required is that the court be satisfied that appellant had abused the opportunity granted him not to be incarcerated" (cleaned up)); *Nelson v. United States*, 225 F.2d 902, 903 (10th Cir. 1955) (holding that "[c]ourts may not act arbitrarily in revoking probations, but all that is required is evidence and facts which reasonably satisfy the judge that the probationer's conduct has not been as good as that required by the conditions of probation"); *accord Yates v. United States*, 308 F.2d 737 (10th Cir. 1962); *Rodgers v. United States*, 413 F.2d 251 (10th Cir. 1969).

This was thus the backdrop against which Congress -- in a single, historic statutory overhaul represented by the 1984 CCCA -- simultaneously touched nearly all forms of judicial supervision by (1) rewriting the probation statutes, (2) creating the new process for conditional discharge and revocation under § 4246, and (3) authorizing a contempt sanction for violation of the freshly minted sentence of supervised release. The synchronous enactment alone is of great moment for interpretive purposes. *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (noting that the presumption of consistent meaning between statutory language "certainly makes the most sense when the statutes were enacted

53

by the same legislative body at the same time") (quoted in *United States v. Simms*, 914 F.3d 229, 243 (4th Cir. 2019) (en banc)); *see also Stevenson's Heirs v. Sullivant*, 18 U.S. 207, 220 (1820) ("These laws have extraordinary claims to be considered as one statute. They were compiled at the same time, by the same committee, composed of the ablest lawyers and civilians of their country -- enacted at the same session of the same legislative body, in the same year, (1785;) and, lastly, all went into operation at the same time, on the 1st of January, 1789.").

The canons aside, aligning the revocation proof standards for each of the three types of judicial supervision makes good sense. As noted, the 1980 and 1983 Reports recognized the similarities between probation and conditional discharge under § 4246(f). We have, in turn, recognized that probation and supervised release are nearly identical in form. *United States v. Copley*, 978 F.2d 829, 831 (4th Cir. 1992) ("Supervised release and probation differ only in that the former follows a prison term and the latter is in lieu of a prison term.").

It follows ineluctably that Congress found satisfactory the existing judicial proof standard governing revocation of probation, the primary form of judicial supervision at the time. And that standard is, at a minimum, instructive as to the proper proof standard governing revocation of conditional discharge under § 4246(f), as both bear on the same concept of judicial supervision, were enacted simultaneously, and were compared to one another by the Judiciary Committee in the years leading to the 1984 CCCA. And that would be the end of the interpretive process, with a seamless adoption of the "reasonably satisfied" standard for revocation under §4246(f).

54

Following enactment of the 1984 CCCA, however, the proof-standard scorecard has changed markedly, with at least seven circuits, whether by published or unpublished decision, moving to the preponderance standard for revocation of probation. *United States v. Teran*, 98 F.3d 831, 836 (5th Cir. 1996) ("The revoking court must base a finding of a probation violation on a preponderance of the evidence."); *United States v. Bujak*, 347 F.3d 607, 609 (6th Cir. 2003) (holding "that the preponderance of the evidence standard also applies to determinations of whether a probationer has violated a condition of probation"); *United States v. Smith*, 767 F.2d 521, 523–24 (8th Cir. 1985) ("[T]he standard of proof required for probation revocation is only a preponderance of the evidence . . . ."); *United States v. Verduzco*, 330 F.3d 1182, 1185 (9th Cir. 2003) (noting that the difference between probation and supervised released revocation is "inconsequential" for evidentiary purposes); *United States v. Lyons*, 312 F. App'x 133, 134 (10th Cir. 2009) (affirming the district court's finding that, by a preponderance of the evidence, the defendant violated probation); *United States v. Lamelas-Linares*, 181 F. App'x 788, 789 (11th Cir. 2006) (noting that violation of probation need only be found using a preponderance of the evidence standard); *United States v. Hooker*, 993 F.2d 898, 900 (D.C. Cir. 1993) (finding the preponderance of the evidence standard to be the appropriate standard for revocation of probation proceedings).

We have followed a similar course. We used the "reasonably satisfied" standard exclusively until approximately one decade ago. *United States v. Simmons*, 370 F. App'x 374, 375 (4th Cir. 2010) ("The court must be reasonably satisfied that the defendant violated a condition of probation."); *United States v. Bartrug*, No. 93-5829, 1995 WL

55

444836, at \*1 (4th Cir. Jul. 28, 1995) ("We find that there was sufficient evidence presented in this case from which the district court could be reasonably satisfied that Bartrug violated the conditions of his probation and supervised release."); *United States v. Cates*, 402 F.2d 473, 474 (4th Cir. 1968) ("Revocation is discretionary with the District Judge, and he need only be reasonably satisfied that a probationer has violated the terms of his release."); *United States v. Williams*, 378 F.2d 665, 666 (4th Cir. 1967) ("All that is required is that the evidence and facts be such as to reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of the probation." (cleaned up)).

More recently, we have consistently used the preponderance standard for probation revocation. *United States v. Sadeghi*, 616 F. App'x 607, 608 (4th Cir. 2015) ("Rather, the district court need only find a violation of a probation term by a preponderance of the evidence."); *United States v. Kirby*, 547 F. App'x 363, 364 (4th Cir. 2013) ("To revoke a defendant's probation, the district court need only find a violation by a preponderance of the evidence."); *United States v. Carroway*, 410 F. App'x 712, 712 (4th Cir. 2011) ("The district court need find a violation of a term of probation by only a preponderance of the evidence."). This change may find its origins in a combination of factors, including (1) the trend in the circuits, (2) our 1992 observation that "[s]upervised release and probation differ only in that the former follows a prison term and the latter is in lieu of a prison term," *United States v. Copley*, 978 F.2d 829, 831 n.\* (4th Cir. 1992), and (3) perhaps the 1986 "technical amendment" to § 3583(e)(3) requiring that violations of supervised release conditions be based on findings by a preponderance. Pub. L. No. 99-570, 100 Stat. 3207

56

(1986) (codified at 18 U.S.C. § 3283(e)(3)). Irrespective of the reason, it appears we now require the finding of a probation violation by a preponderance of the evidence.

Considering (1) the 1980 and 1983 Reports equating probation and conditional discharge, (2) Congress' apparent satisfaction with the proof standard for probation revocation as it existed at the time of the 1984 CCCA, (3) Congress' amendment to § 3583(e)(3) to require use of the preponderance standard in the supervised release revocation process, and (4) the parallel we observed decades ago between probation and supervised release, we think it fully supported by the statutory text, the legislative history, consistency, and good sense to require use of the preponderance standard for revocations uniformly across the three essentially identical judicial supervision processes for conditional discharge, probation, and supervised release. Furthermore, we apply that standard to both determinations necessary for revocation under § 4246(f), namely, (1) the failure to comply with a conditional discharge treatment regimen, and (2) whether that failure gives rise to dangerousness and revocation.

## B.    *Conducting the Dangerousness Inquiry*

We now move to the second question presented in this appeal, namely, the process by which the district court will make its revocation findings under § 4246(f) (the "dangerousness inquiry" or "risk assessment"). As noted, the district court observed as follows during the revocation hearing for Mr. Perkins:

> This is a very new area for the Court to get into. In the past, I had felt — and I guess I still do — that violation of the order of conditional release is in itself a qualification for — a reason for revocation of conditional release and recommitting the respondent to the custody of the Attorney General.

I really don't — and I hope the Fourth Circuit will amplify what it meant by having to find these additional requirements.

J.A. 138–39. After reciting the violations it found to have existed, the district court stated without elaboration "that the violations heretofore set out depicting the conduct of the defendant during his release *would create a substantial risk of bodily injury to another person or serious damage to the property of another*." *Id.* 141 (emphasis added).

The district court's desire for guidance is one shared by other courts. *See, e.g.*, *United States v. Sahhar*, 917 F.2d 1197, 1207 (9th Cir. 1990) ("Section 4246 provides little guidance as to how the government must prove that the person to be committed poses a substantial risk of causing bodily injury or serious property damage. . . . Rather, the substantial risk requirement 'guides the judge who must make the commitment decision,' and creates essentially the same standard for federal involuntary commitment as used in many state procedures." (cleaned up)).

As noted, the § 4246(f) revocation decision hinges upon the outcome of a hearing, after which the district court must determine "whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(f). The plain meaning of the text is whether the (1) subject's "failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment" (2) *would result in* "a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C.A. § 4246.

58

We have not previously discussed at length the applicable factors for making and supporting the second part of the statutory standard, namely, the dangerousness determination. The most frequently cited source for that purpose, and one we have relied upon in our unpublished decisions, is *United States v. Ecker*, 30 F.3d 966 (8th Cir. 1994), and the few factors there noted. Those factors are "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incidents manifesting dangerousness, and a history of problems taking prescribed medicines." *Id.* at 970–71 (cited in *United States v. Taylor*, 644 F. App'x 227, 228 (4th Cir. 2016); *United States v. Conroy*, 546 F. App'x 311, 315 (4th Cir. 2013); *United States v. Sellers*, 549 F. App'x 139, 141 (4th Cir. 2013); *United States v. Taylor*, 311 F. App'x 678, 679 (4th Cir. 2009)). The *Ecker* list of factors apparently originated thirty years ago from their mention and use by an expert in the case referred to only as "Dr. Quinn." *Id.* at 970.[13]

---

[13] More recently, the Eighth Circuit has offered additional, helpful guidance respecting the dangerousness determination:

"Overt acts of violence are not required to demonstrate dangerousness." "[D]elusions and threats [are] enough to prove dangerousness even though [the] defendant never had the opportunity to act on them." The fact that a person's "recent behavior has been vastly improved," on its own, "does not require a finding that [the detainee] is not dangerous." "[T]he recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence." Nor does that fact, coupled with a detainee's "minimal history of actual violence," require a finding that the detainee is not dangerous. "A finding of substantial risk under § 4246 may be based on any activity that evinces a genuine possibility of future harm to persons or property."

*United States v. Dalasta*, 3 F.4th 1121, 1125 (8th Cir. 2021) (cleaned up).

These factors and guidance have proven helpful. But the concepts of dangerousness and risk assessment are increasingly complex, multifaceted, and continually evolving. For example, one watershed development post-*Ecker* was the multiyear study and 1998 publication of *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence*. John Monahan *et al.*, Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence (2001) ("MacArthur Study"). One reviewer observed as follows the year following publication of the MacArthur Study:

> This book is a clarion call for a new method of assessing an individual's risk of violence toward others in a community setting. It presents findings from the MacArthur Violence Risk Assessment Study, a project conducted by some of the nation's leading forensic clinicians and researchers. Ten years in the making, Rethinking Risk Assessment turns previous risk assessment methods on their heads. Despite the fact that we have known for many years that statistical methods of risk assessment are superior to clinical methods, the old ways die hard.
>
> . . . .
>
> The authors reviewed *134 risk factors*, grouping them into "criminological" and "clinical" categories. For clinical purposes, they recommend a subset of 106 factors for which information is readily obtainable. They conclude that univariate predictors of violence have been shown to be poor predictors and that an interactional approach is necessary. With this approach, one variable could be a positive risk factor for violence in one group, unrelated to violence in another group, and protective against violence in a third group.

Theodore Lawler, M.D., 53 Psychiatric Servs. 1355, 1484-a (2002) (reviewing MacArthur Study) (emphasis added). As indicated in the emphasized portion, potentially material factors predicting dangerousness were becoming practically innumerable even twenty years ago.

60

Additionally, some have criticized the MacArthur Study. Just a decade following its publication, in the very same scholarly publication where it was praised by the reviewer above cited, other commentators undertook a published debate with the MacArthur Study authors, disagreeing with its findings and faulting its research design. E. Fuller Torrey, M.D. *et al.*, *The MacArthur Violence Risk Assessment Study Revisited: Two Views Ten Years After Its Initial Publication*, 59 Psychiatric Servs. 135, 147 (2008).

And if the calculus on applicable factors and predictive techniques could not be more muddled, the debate -- and development of newer predictive techniques such as actuarial risk assessment tools -- continues presently:

> With the advent of actuarial, statistically driven violence risk assessment measures and research on their predictive powers, it has been debated whether they are superior to clinical judgment in assessing violence risk. Some authors argue that clinical methods without structure are susceptible to bias, oversight of important risk factors, and lack of reliability and validity. Others have found actuarial assessments to be limited in that they yield risk stratification but without incorporating contextual and dynamic shifts relevant to an individual's risk presentation. That said, the actuarial instruments were not intended to design interventions in treatment, and recent studies have highlighted that although these tools identify risk levels, they do not provide all that is needed for individualized treatment and release planning. Still, clinicians in specific settings, especially within correctional and forensic systems, might use actuarial-type VRAIs to add additional data in the risk assessments needed for decision making.

Debra A. Pinals, M.D., *Violence Risk Assessment in Clinical Settings: Enduring Challenges and Evolving Lessons*, 29 Harv. Rev. Psych. 90, 91 (2021) (noting additionally that, "[i]ronically, even some structured risk assessment tools, developed and promulgated as 'objective' and 'unbiased,' are now being critiqued for being built upon a foundation of variables fraught with biases and other structural limitations").

61

Dr. Pinals' work and her citation to an American Psychiatric Association ("APA") Resource Document are especially helpful. Her article includes widely accepted clinical factors for determining dangerousness:

> Prototypical, clinically relevant violence-associated risk factors include the following: past history of violence, prior arrest history, young age at first arrest, history of substance use, prior fire setting, animal cruelty, risk-taking behavior, impulsivity, current mental state circumstances, nonadherence to treatment, access to weapons, dynamics in the household [including the role of a significant other and/or caretaker (either provocative or not protective)], viewing oneself as a victim, lack of [compassion and] empathy, overt intention to harm, and lack of concern over [consequences of] violent act. In acute settings, hostility and suspiciousness might signal risk of acute aggression.

*Id.* at 91 (citing APA Resource Document, Work Group on Psychiatric Violence Risk Assessment, APA Council on Psychiatry and Law, Alec Buchanan, Renee Binder *et al.*, 169 Am. J. Psych. 340 (2012) (data supplement attached to article stating, "The APA published a Task Force report, 'Clinical Aspects of the Violent Individual,' in 1974. Since then, the assessment of violence risk by psychiatrists has assumed increased prominence. At the same time, significant changes have taken place both in the contexts in which psychiatrists assess risk and in the techniques that help them do so") (footnotes omitted)).

There is an additional wrinkle when one considers whether it remains practical to assemble a list of factors for consideration by the district courts. Civil commitment has long resided primarily in the hands of the state sovereigns. The Supreme Court has recognized that "'[t]he States have traditionally exercised broad power to commit persons found to be mentally ill.'" *United States v. Comstock*, 560 U.S. 126, 144 (2010) (quoting *Jackson v. Indiana*, 406 U.S. 715, 736 (1972)). Congress recognized as much, given its

multiple references in Chapter 313 and its predecessor statute's provisions to having state authorities assume responsibility for those persons hospitalized after being found not guilty by reason of insanity and those due for release but suffering from a mental disease. *See* 18 U.S.C. § 4243(e) ("The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment."); 18 U.S.C. § 4246(d) (same). The 1983 Report is in accord. *See* 1983 Report at 250 (noting the primary justification for § 4246 hinged upon uncertainty as to whether the several states would fulfill their traditional responsibilities in this area: "Section 4246 covers those circumstances where State authorities will not institute civil commitment proceedings against a hospitalized defendant whose Federal sentence is about to expire or against whom all criminal charges have been dropped for reasons related to his mental condition and who is presently mentally ill. At such a point the responsibility for the care of insane persons is essentially a function of the States. The Committee intends that this section be used only in those rare circumstances where a person has no permanent residence or there are no State authorities willing to accept him for commitment.").

Even prior to the decision in *O'Connor v. Donaldson*, 422 U.S. 563 (1975), state legislatures were busy amending their statutory schemes for involuntary commitment. *Id.* at 576 ("In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."); *see* Megan Testa & Sara G. West, *Civil Commitment in the United States*, Psychiatry, Oct. 2010, at 33 (discussing the "Shift To Dangerousness Criteria As The Standard For Civil Commitment" commencing in 1964

in the District of Columbia) (case adjusted); *id.* ("Currently, there are only a few states that do not follow the trend."). In fact, however, all states use some form of the "danger to self" and "danger to others" standards when determining whether involuntary commitment is appropriate.[14] Some states also use "danger to property" in their standard.[15]

---

[14] *See* Ala. Code § 22-52-10.4(a)(2) (West 2022); Alaska Stat. Ann. § 47.30.755(a) (West 2022); Ariz. Rev. Stat. Ann. § 36-540 (West 2022); Ark. Code Ann. § 20-47-207(c)(1) (West 2022); Cal. Welf. & Inst. Code § 5250(a) (West 2022); Colo. Rev. Stat. Ann. § 27-65-113 (West 2022); Conn. Gen. Stat. Ann. § 17a-498(c)(3) (West 2022); Del. Code Ann. tit.16, § 5002 (West 2022); D.C. Code Ann. § 21-545(b)(2) (West 2022); Fla. Stat. Ann. § 394.467(1) (West 2022); Ga. Code Ann. § 37-3-1(9.1) (West 2022); Haw. Rev. Stat. Ann. § 334-60.2 (West 2022); Idaho Code Ann. § 66-329(11) (West 2022); 405 Ill. Comp. Stat. Ann. 5/1-119, 5/3-700 (West 2022); Ind. Code Ann. § 12-26-6-8(a) (West 2022); Iowa Code Ann. § 229.13 (West 2022); Kan. Stat. Ann. § 59-2946(f)(1) (West 2022); Ky. Rev. Stat. Ann. §§ 202A.026(1), 202A.011(2) (West 2022); La. Stat. Ann. §§ 28:55(E)(1), 28:2(3)-(4) (West 2022); Me. Rev. Stat. Ann. Tit. 34-B, §§ 3801(4-A), 3864(6)(A) (West 2022); Md. Code Ann., Health-Gen. §10-632(e)(2) (West 2022); Mass. Gen. Laws Ann. Ch. 123, §§ 1, 8(a) (West 2022); Mich. Comp. Laws Ann. § 330.1401(1) (West 2022); Minn. Stat. Ann. §§ 253B.02 subd. 17a(a), 253B.09(1) (West 2022); Miss. Code Ann. § 41-21-61(f) (West 2022); Mo. Ann. Stat. §§ 632.005(10), 632.350(5) (West 2022); Mont. Code Ann. § 53-21-126(1) (West 2022); Neb. Rev. Stat. § 71-908 (West 2022); Nev. Rev. Stat. Ann. §§ 433A.0195 (West 2022); N.H. Rev. Stat. Ann. §§ 135-C:27, 34 (West 2022); N.J. Stat. Ann. § 30:4-27.2(h)-(i) (West 2022); N.M. Stat. Ann. § 43-1-11(M), (N) (West 2022); N.Y. Mental Hyg. Law § 9.01 (West 2022); N.C. Gen. Stat. Ann. § 122C-3(11) (West 2022); N.D. Cent. Code Ann. §§ 25-03.1-02, 25-03.1-07 (West 2022); Ohio Rev. Code Ann. §§ 5122.01, 5122.15 (West 2022); Okla. Stat. Ann. tit. 43A, §§ 1-103, 5-415 (West 2022); Or. Rev. Stat. Ann. §§ 426.005(f), 426.130 (West 2022); 50 Pa. Stat. & Cons. Stat. Ann. § 7304 (West 2022); 40.1 R.I. Gen. Laws Ann. §§ 40.1-5-8, 40.1-5-2(7) (West 2022); S.C. Code Ann. §§ 44-17-580, 44-23-10(13) (West 2022); S.D. Codified Laws §§ 27A-1-1, 27A-1-2 (West 2022); Tenn. Code Ann. §§ 33-6-501, 33-6-502 (West 2022); Tex. Health & Safety Code Ann. § 574.034 (West 2022); Utah Code Ann. §§ 62A-15-602, 62A-15-631 (West 2022); Vt. Stat. Ann. tit. 18, §§ 7101, 7611 (West 2022); Va. Code Ann. § 37.2-817 (West 2022); Wash. Rev. Code Ann. §§ 71.05.020, 71.05.240 (West 2022); W. Va. Code Ann. §§ 27-5-4, 27-1-12 (West 2022); Wis. Stat. Ann. § 51.20 (West 2022); Wyo. Stat. Ann. §§ 25-10-101, 25-10-110 (West 2022).

[15] *See* Alaska Stat. Ann. § 47.30.915(12)(B) (West 2022); Kan. Stat. Ann. § 59-2946(f)(1) (West 2022); N.J. Stat. Ann. §§ 30:4-27.2(h)-(i) (West 2022); N.C. Gen. Stat.
(Continued)

As science and experience have coincided across the decades, so too has state law developed on what factors are predictive of dangerousness. Given the frontline, long-term expertise developed by the state sovereigns in this difficult and developing area, the factors they have found helpful justifiably aid our inquiry under § 4246. A nationwide statutory survey reveals the following factors have drawn state legislative attention:

1. *The individual presents a risk of suicide, including past or future threats or attempts;*[16]

---

Ann. § 122C-3(11) (West 2022); N.D. Cent. Code Ann. §§ 25-03.1-02, 25-03.1-07 (West 2022); Wash. Rev. Code Ann. §§ 71.05.020, 71.05.240 (West 2022); W. Va. Code Ann. §§ 27-5-4, 27-1-12 (West 2022).

[16] Ariz. Rev. Stat. Ann. § 36-501(8) (West 2022) ("'Danger to self': (a) Means behavior. . . including attempted suicide or the serious threat thereof . . . ."); Ark. Code Ann. § 20-47-207(c)(2)(A) (West 2022) ("[A] clear and present danger to himself or herself [can be] established by demonstrating that: (A) [t]he person . . . has attempted suicide . . . ."); Colo. Rev. Stat. Ann. § 27-65-102(10) (West 2022) ("'Danger to self or others' means: (a) A person poses a substantial risk of physical harm to the person's self as manifested by evidence of recent threats of or attempts at suicide . . . ."); Haw. Rev. Stat. Ann. § 334-1 (West 2022) ("'Dangerous to self' means the person recently has: (1) Threatened or attempted suicide . . . ."); Idaho Code Ann. § 66-317(10) (West 2022) ("'Likely to injure himself or others' means: (a) A substantial risk that physical harm will be inflicted by the proposed patient upon his own person, as evidenced by threats or attempts to commit suicide . . . ."); Me. Rev. Stat. Ann. tit. 34-B, §§ 3801(4-A) (West 2022) ("'Likelihood of serious harm' means: . . . [a] substantial risk of physical harm to the person as manifested by recent threats of, or attempts at, suicide."); Mass. Gen. Laws Ann. ch. 123, § 1 (West 2022) ("'Likelihood of serious harm', [is defined as] a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide."); Mo. Ann. Stat. § 632.005(10) (West 2022) ("Likelihood of serious harm" means . . . a substantial risk that serious physical harm will be inflicted by a person upon his own person, as evidenced by recent threats, including verbal threats, or attempts to commit suicide."); Neb. Rev. Stat. Ann. § 71-908 (West 2022) ("'Mentally ill and dangerous person' means a person who is mentally ill . . . and because of such mental illness . . . (Continued)

65

presents a substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of, suicide."); Nev. Rev. Stat. Ann. § 433A.0195 (West 2022) ("A person shall be deemed to present a substantial likelihood of serious harm to himself or herself . . . if . . . the person is at serious risk of attempting suicide."); N.H. Rev. Stat. Ann. § 135-C:27 (West 2022) ("'Danger to self' is established by demonstrating that within 40 days of the completion of the petition, the person has . . . attempted suicide . . . and there is a likelihood the act or attempted act will recur if admission is not ordered."); N.J. Stat. Ann. § 30:4-27.2 (West 2022) ("'Dangerous to self" means that by reason of mental illness the person has threatened or attempted suicide."); N.M. Stat. Ann. § 43-1-3(M) (West 2022) ("'[L]ikelihood of serious harm to oneself' means that it is more likely than not that in the near future the person will attempt to commit suicide."); N.Y. Mental Hyg. Law § 9.01 (West 2022) ("'Likelihood to result in serious harm' or 'likely to result in serious harm' means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide."); N.C. Gen. Stat. Ann. § 122C-3(11) (West 2022) ("'Dangerous to self'[means] . . . the individual has attempted suicide or threatened suicide and that there is a reasonable probability of suicide unless adequate treatment is given."); N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) ("Serious risk of harm" includes "a substantial likelihood" of "[s]uicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential . . . ."); Ohio Rev. Code Ann. § 5122.01 (West 2022) ("Mentally ill person subject to court order" means a person who "[r]epresents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide . . . ."); Okla. Stat. Ann. tit. 43A, § 1-103 (West 2022) ("Person requiring treatment" means a person who "poses a substantial risk of immediate physical harm to self as manifested by evidence or serious threats of or attempts at suicide . . . ."); 50 Pa. Stat. & Cons. Stat. Ann. § 7304 (West 2022) (determination of clear and present danger when there is "attempted suicide"); 40.1 R.I. Gen. Laws Ann. § 40.1-5-2 (West 2022) ("Likelihood of serious harm" means a "substantial risk of physical harm to the person himself or herself as manifested by behavior evidencing serious threats of, or attempts at, suicide . . . ."); S.C. Code Ann. § 44-23-10 (West 2022) ("Likelihood of serious harm" means "a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide . . . ."); S.D. Codified Laws § 27A-1-1(7) (West 2022) ("Danger to self" means a "reasonable expectation that the person will inflict serious physical injury upon himself or herself in the near future . . . as evidenced by . . . the person's recent acts or omissions which constitute a danger of suicide . . . ."); Tenn. Code Ann. § 33-6-501 (West 2022) (Continued)

2. *The individual presents a risk of substantial self-harm, including history and threats of self-harm;*[17]

---

(finding that an individual poses a "substantial likelihood of serious harm" when the individual "has threatened or attempted suicide"); Utah Code Ann. § 62A-15-602 (West 2022) ("'Substantial danger' means that due to mental illness, an individual is at serious risk of . . . suicide . . . ."); Vt. Stat. Ann. tit. 18, § 7101 (West 2022) ("A danger of harm to himself or herself may be shown by establishing that . . . he or she has threatened or attempted suicide . . . ."); Wash. Rev. Code Ann. § 71.05.020 (West 2022) ("Likelihood of serious harm" means there is a substantial risk that "[p]hysical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself . . . ."); W. Va. Code Ann. § 27-1-12 (West 2022) (finding of dangerousness if the "individual has threatened or attempted suicide"); Wis. Stat. Ann. § 51.20 (West 2022) (finding of dangerousness when there is "evidence of recent threats of or attempts at suicide"); Wyo. Stat. Ann. § 25-10-101 (West 2022 (finding of dangerousness when there is "evidence of recent threats of or attempts at suicide").

[17] Ala. Code § 22-52-10.4(a)(2) (West 2022) ("Respondent poses a real and present threat of substantial harm to self."); Alaska Stat. Ann. § 47.30.915(12)(A) (West 2022) ("'[L]ikely to cause serious harm' means a person who (A) poses a substantial risk of bodily harm to that person's self, as manifested by recent behavior causing, attempting, or threatening that harm . . . ."); Ariz. Rev. Stat. Ann. § 36-501(8)(a)(i) (West 2022) ("'Danger to self': (a) Means behavior that, as a result of a mental disorder: (i) Constitutes a danger of inflicting serious physical harm on oneself . . . ."); Ark. Code Ann. § 20-47-207(c)(2) (West 2022) ("'[A] clear and present danger to himself or herself' is established by demonstrating that: (A) The person has inflicted serious bodily injury on himself or herself or has attempted . . . serious self-injury, and there is a reasonable probability that the conduct will be repeated if admission is not ordered; [or] (B) The person has threatened to inflict serious bodily injury on himself or herself, and there is a reasonable probability that the conduct will occur if admission is not ordered . . . ."); Cal. Welf. & Inst. Code § 5250(a) (West 2022) ("If a person is detained . . . and has received an evaluation, he or she may be certified for not more than 14 days of intensive treatment related to the mental health disorder or impairment by chronic alcoholism, . . . if . . . the person is, as a result of a mental health disorder or impairment by chronic alcoholism, a danger to . . . himself or herself . . . ."); Colo. Rev. Stat. Ann. § 27-65-102(10) (West 2022) ("'Danger to the person's self or others' means: (a) A person poses a substantial risk of physical harm to the person's self as manifested by evidence of recent threats of . . . serious bodily harm to himself or herself . . . ."); Conn. Gen. Stat. Ann. § 17a-495(b) (West 2022) ("For the purpose of [Section 17a-498] . . . 'dangerous to himself or herself . . .' means there is a (Continued)

67

substantial risk that physical harm will be inflicted by an individual upon his or her own person . . . ."); Del. Code Ann. tit. 16, § 5001(4) (West 2022) ("'Dangerous to self' means that by reason of mental condition there is a substantial likelihood that the person will imminently sustain serious bodily harm to oneself. This determination shall take into account a person's history, recent behavior, and any recent act or threat."); D.C. Code Ann. § 21-545(b)(2) (West 2022) ("If the Court or jury finds that the person is mentally ill and, because of that mental illness, is likely to injure himself . . . if not committed, the Court may order the person's commitment . . . ."); Fla. Stat. Ann. § 394.467(1) (West 2022) ("A person may be ordered for involuntary inpatient placement for treatment upon a finding . . . that . . . [t]here is substantial likelihood that in the near future he or she will inflict serious bodily harm on self . . . , as evidenced by recent behavior causing, attempting, or threatening such harm . . . ."); Ga. Code Ann. § 37-3-1(9.1) (West 2022) ("'Inpatient' means a person who is mentally ill and: (A)(i) Who presents a substantial risk of imminent harm to that person . . . , as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person . . . ."); Haw. Rev. Stat. Ann. § 334-1 (West 2022) ("'Dangerous to self' means the person recently has: (1) Threatened or attempted . . . serious bodily harm . . . ."); Idaho Code Ann. § 66-317(10) (West 2022) ("'Likely to injure himself . . .' means . . . (a) A substantial risk that physical harm will be inflicted by the proposed patient upon his own person, as evidenced by threats or attempts to . . . inflict physical harm on himself . . . ."); 405 Ill. Comp. Stat. Ann. 5/1-119(1) (West 2022) ("'Person subject to involuntary admission on an inpatient basis' means: (1) A person with mental illness who because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person . . . in physical harm . . . ."); Ind. Code Ann. § 12-7-2-53 (West 2022) ("'Dangerous', for purposes of [Section] 12-26, means a condition in which an individual as a result of mental illness, presents a substantial risk of: (1) suffering self-caused harm . . . ."); Iowa Code Ann. § 229.1(20) (West 2022) ("'Seriously mentally impaired' or 'serious mental impairment' describes the condition of a person with mental illness . . . and who because of that illness . . . [i]s likely to physically injure the person's self . . . if allowed to remain at liberty without treatment."); Kan. Stat. Ann. § 59-2946(f)(3) (West 2022) ("'Likely to cause harm to self . . . ' means that the person, by reason of the person's mental disorder: (A) Is likely, in the reasonably foreseeable future, to cause substantial physical injury or physical abuse to self . . . as evidenced by behavior threatening, attempting or causing such injury . . . ."); Me. Rev. Stat. Ann. tit. 34-B, § 3801(4-A) (West 2022) ("'Likelihood of serious harm' means: . . . [a] substantial risk of physical harm to the person as manifested by recent threats of, or attempts at, . . . serious self-inflicted harm."); Mass. Gen. Laws Ann. ch. 123, § 1 (West 2022) ("'Likelihood of serious harm', [is defined as] a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, . . . serious bodily harm."); Mich. Comp. Laws Ann. § 330.1401(1) (West 2022) ("'Person requiring treatment' means . . . an individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to (Continued)

68

intentionally or unintentionally seriously physically injure himself . . . and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."); Minn. Stat. Ann. § 253B.02 subd. 17a(a) (West 2022) ("A 'person who poses a risk of harm due to a mental illness' means any person who has [a mental illness] and who, due to this impairment, poses a substantial likelihood of physical harm to self . . . . as demonstrated by . . . a recent attempt or threat to physically harm self."); Mo. Ann. Stat. § 632.005(10) (West 2022) ("'Likelihood of serious harm' means . . . a substantial risk that serious physical harm will be inflicted by a person upon his own person, as evidenced by recent threats, including verbal threats, or attempts to . . . inflict physical harm on himself . . . [or] patterns of behavior that historically have resulted in serious harm previously being inflicted by a person upon himself."); Mont. Code Ann. § 53-21-126(1) (West 2022) ("In determining whether the respondent requires commitment . . . the court shall consider . . . whether the respondent has recently, because of a mental disorder and through an act or omission, caused self-injury . . . [and] whether . . . there is an imminent threat of injury to the respondent . . . because of the respondent's acts or omissions."); Neb. Rev. Stat. Ann. § 71-908 (West 2022) ("'Mentally ill and dangerous person' means a person who is mentally ill . . . and because of such mental illness . . . presents a substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of . . . serious bodily harm."); Nev. Rev. Stat. Ann. § 433A.0195 (West 2022) ("A person shall be deemed to present a substantial likelihood of serious harm to himself or herself . . . if . . . the person is at serious risk of . . . causing bodily injury to himself or herself."); N.H. Rev. Stat. Ann. § 135-C:27 (West 2022) ("'Danger to self' is established by demonstrating that within 40 days of the completion of the petition, the person has inflicted serious bodily injury on himself or has attempted . . . serious self-injury and there is a likelihood the act or attempted act will recur if admission is not ordered . . . [or] the person has threatened to inflict serious bodily injury on himself and there is likelihood that an act or attempt of serious self-injury will occur."); N.J. Stat. Ann. § 30:4-27.2 (West 2022) ("'Dangerous to self" means that by reason of mental illness the person has threatened or attempted . . . serious bodily harm."); N.M. Stat. Ann. § 43-1-3(M) (West 2022) ("'[L]ikelihood of serious harm to oneself' means that it is more likely than not that in the near future the person . . . will cause serious bodily harm to the person's self by violent or other self-destructive means, including grave passive neglect."); N.Y. Mental Hyg. Law § 9.01 (West 2022) ("'Likelihood to result in serious harm' or 'likely to result in serious harm' means (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at . . . serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself."); N.C. Gen. Stat. Ann. § 122C-3(11) (West 2022) ("'Dangerous to self'[means] . . . the individual has mutilated himself or herself and has attempted to mutilate himself or herself and that there is a reasonable probability of self-mutilation unless adequate treatment is given."); Ohio Rev. Code Ann. § 5122.01 (West 2022) ("Mentally ill person subject to court order" means a person who "[r]epresents a substantial risk of physical harm to self as manifested by (Continued)

69

### 3. *The individual presents a risk of inflicting substantial bodily harm to others, including history and threats*;[18]

evidence of threats of, or attempts at, . . . serious self-inflicted bodily harm . . . ."); Okla. Stat. Ann. tit. 43A, § 1-103 (West 2022) ("Person requiring treatment" means a person who "poses a substantial risk of immediate physical harm to self as manifested by evidence or serious threats of or attempts at . . . significant self-inflicted bodily harm . . . ."); 50 Pa. Stat. & Cons. Stat. Ann. § 7304 (West 2022) (determination of clear and present danger when there is "self-mutilation"); S.C. Code Ann. § 44-23-10 (West 2022) ("Likelihood of serious harm" means "a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, . . . serious bodily harm . . . ."); S.D. Codified Laws § 27A-1-1(7) (West 2022) ("Danger to self" means a "reasonable expectation that the person will inflict serious physical injury upon himself or herself in the near future . . . as evidenced by . . . the person's recent acts or omissions which constitute a danger of . . . self-inflicted serious physical injury."); Tenn. Code Ann. § 33-6-501 (West 2022) (finding that an individual poses a "substantial likelihood of serious harm" when the individual "has threatened or attempted . . . to inflict serious bodily harm" to oneself); Tex. Health & Safety Code Ann. § 574.034 (West 2022) (finding dangerousness of the individual "is likely to cause serious harm to" oneself); Utah Code Ann. § 62A-15-602 (West 2022) ("'Substantial danger' means that due to mental illness, an individual is at serious risk of . . . serious bodily self-injury . . . ."); Vt. Stat. Ann. tit. 18, § 7101 (West 2022) ("A danger of harm to himself or herself may be shown by establishing that . . . he or she has threatened or attempted . . . serious bodily harm . . . ."); Va. Code Ann. § 37.2-817 (West 2022) (finding of dangerousness when "there is a substantial likelihood that, as a result of mental illness, the person will, in the near future, . . . cause serious physical harm to himself"); Wash. Rev. Code Ann. § 71.05.020 (West 2022) ("Likelihood of serious harm" means there is a substantial risk that "[p]hysical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to . . . inflict physical harm on oneself . . . ."); W. Va. Code Ann. § 27-1-12 (West 2022) (finding of dangerousness if the "individual has threatened or attempted . . . serious bodily harm to himself or herself"); Wis. Stat. Ann. § 51.20 (West 2022) (finding of dangerousness when there is "evidence of recent threats of or attempts at . . . serious bodily harm); Wyo. Stat. Ann. § 25-10-101 (West 2022) (finding of dangerousness when there is "evidence of recent threats of or attempts at . . . serious bodily harm").

[18] Ala. Code § 22-52-10.4(a)(2) (West 2022) ("[R]espondent poses a real and present threat of substantial harm to . . . others . . . ."); Alaska Stat. Ann. § 47.30.915(12(B)) (West 2022) ("'[L]ikely to cause serious harm' means a person who . . . (B) poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person . . . ."); Ariz. Rev. Stat. Ann. § 36-501(7) (West 2022) (Continued)

70

("'Danger to others' means . . . as a result of the person's mental disorder the person's continued behavior can reasonably be expected, on the basis of competent medical opinion, to result in serious physical harm."); Ark. Code Ann. § 20-47-207(c)(3) (West 2022) ("As used in this subsection, 'a clear and present danger to others' is established by demonstrating that the person has inflicted, attempted to inflict, or threatened to inflict serious bodily harm on another, and there is a reasonable probability that the conduct will occur if admission is not ordered."); Cal. Welf. & Inst. Code § 5250(a) (West 2022) ("The professional staff of the agency or facility providing evaluation services has analyzed the person's condition and has found the person is, as a result of a mental health disorder or impairment by chronic alcoholism, a danger to others . . . ."); Colo. Rev. Stat. Ann. § 27-65-102(10) (West 2022) ("'Danger to . . . others' means: . . . (b) A person poses a substantial risk of physical harm to another person or persons, as manifested by evidence of recent homicidal or other violent behavior by the person in question . . . ."); Conn. Gen. Stat. Ann. § 17a-495(b) (West 2022) ("For the purpose of [Section 17a-498] . . . 'dangerous to . . . others' means there is a substantial risk that physical harm will be inflicted by an individual upon . . . another person . . . ."); Del. Code Ann. tit. 16, § 5001(3) (West 2022) ("'Dangerous to others' means that by reason of mental condition there is a substantial likelihood that the person will inflict serious bodily harm upon another person within the immediate future. This determination shall take into account a person's history, recent behavior and any recent act or threat."); D.C. Code Ann. § 21-545(b)(2) (West 2022) ("If the Court or jury finds that the person is mentally ill and, because of that mental illness, is likely to injure . . . others if not committed, the Court may order the person's commitment . . . ."); Fla. Stat. Ann. § 394.467(1) (West 2022) ("A person may be ordered for involuntary inpatient placement for treatment upon a finding . . . that: (a) He or she has a mental illness and because of his or her mental illness . . . [t]here is substantial likelihood that in the near future he or she will inflict serious bodily harm on . . . others, as evidenced by recent behavior causing, attempting, or threatening such harm . . . ."); Ga. Code Ann. § 37-3-1(9.1) (West 2022) ("'Inpatient' means a person who is mentally ill and: (A)(i) Who presents a substantial risk of imminent harm to . . . others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to . . . other persons . . . ."); Haw. Rev. Stat. Ann. § 334-1 (West 2022) ("'Dangerous to others' means likely to do substantial physical or emotional injury on another, as evidenced by a recent act, attempt or threat."); Idaho Code Ann. § 66-317(10) (West 2022) ("'Likely to injure . . . others' means . . . (b) substantial risk that physical harm will be inflicted by the proposed patient upon another as evidenced by behavior which has caused (Continued)

71

such harm . . . ."); 405 Ill. Comp. Stat. Ann. 5/1-119(1) (West 2022) ("A person with mental illness who because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing . . . another in physical harm . . . ."); Ind. Code Ann. § 12-7-2-53(a)(2) (West 2022) ("'Dangerous', for purposes of [Section] 12-26, means a condition in which an individual as a result of mental illness, presents a substantial risk of: . . . harming others."); Iowa Code Ann. § 229.1(20) (West 2022) ("'Seriously mentally impaired' or 'serious mental impairment' describes the condition of a person with mental illness and because of that illness . . . is likely to physically injure . . . others if allowed to remain at liberty without treatment . . . ."); Kan. Stat. Ann. § 59-2946(f) (West 2022) ("'Likely to cause harm to . . . others' means that the person, by reason of the person's mental disorder: (A) Is likely, in the reasonably foreseeable future, to cause substantial physical injury or physical abuse to . . . others . . . as evidenced by behavior threatening, attempting or causing such injury [or] abuse . . . ."); Me. Rev. Stat. Ann. tit. 34-B, § 3801(4-A) (West 2022) ("'Likelihood of serious harm' means: . . . [a] substantial risk of physical harm to other persons as manifested by recent homicidal or violent behavior."); Mass. Gen. Laws Ann. ch. 123, § 1 (West 2022) ("'Likelihood of serious harm', [defined as] . . . a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior."); Mich. Comp. Laws Ann. § 330.1401(1) (West 2022) ("'Person requiring treatment' means . . . an individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure . . . another individual . . . and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation."); Minn. Stat. Ann. § 253B.02 subd. 17a(a) (West 2022) ("A 'person who poses a risk of harm due to a mental illness' means any person who has [a mental illness] and who, due to this impairment, poses a substantial likelihood of physical harm to . . . others as demonstrated by . . . a recent attempt or threat to physically harm . . . others."); Miss. Code Ann. § 41-21-61(f) (West 2022) ("'Person with mental illness' means any person who has a substantial psychiatric disorder . . . which . . . poses a substantial likelihood of physical harm to . . . others as demonstrated by a recent attempt or threat to physically harm . . . others."); Mo. Ann. Stat. § 632.005(10) (West 2022) ("'Likelihood of serious harm'" means . . . a substantial risk that serious physical harm will be inflicted by a person upon another as evidenced by recent overt acts, behavior or threats, including verbal threats, which have caused such harm or which would place a reasonable person in reasonable fear of sustaining such harm . . . [or] patterns of behavior that historically have resulted in physical harm previously being inflicted by a person upon another person."); (Continued)

72

Mont. Code Ann. 53-21-126(1) (West 2022) ("In determining whether the respondent requires commitment . . . the court shall consider . . . whether the respondent has recently, because of a mental disorder and through an act or omission, caused . . . injury to others . . . [and] whether . . . there is an imminent threat of injury to . . . others . . . because of the respondent's acts or omissions."); Neb. Rev. Stat. Ann. § 71-908 (West 2022) ("'Mentally ill and dangerous person' means a person who is mentally ill . . . and because of such mental illness . . . presents a substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm."); Nev. Rev. Stat. Ann. § 433A.0195 (West 2022) ("A person shall be deemed to present a substantial likelihood of serious harm to . . . others if . . . the person is at serious risk of . . . attempting . . . homicide [or] causing bodily injury to . . . others."); N.H. Rev. Stat. Ann. § 135-C:27 (West 2022) ("'Danger to others' is established by demonstrating that within 40 days of the completion of the petition, the person has inflicted, attempted to inflict, or threatened to inflict serious bodily harm on another."); N.M. Stat. Ann. § 43-1-3(N) (West 2022) ("'[L]ikelihood of serious harm to others' means that it is more likely than not that in the near future a person will inflict serious, unjustified bodily harm on another person or commit a criminal sexual offense, as evidenced by behavior causing, attempting or threatening such harm, which behavior gives rise to a reasonable fear of such harm from the person."); N.Y. Mental Hyg. Law § 9.01 (West 2022) ("'[L]ikelihood to result in serious harm' or 'likely to result in serious harm' means a substantial risk of physical harm to other persons manifested by homicidal or other violent behavior."); N.C. Gen. Stat. Ann. § 122C-3(11) (West 2022) ("'Dangerous to others' [means] within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another . . . that there is a reasonable probability that this conduct will be repeated."); N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) (finding of dangerousness when there is a substantial likelihood of "[k]illing or inflicting serious bodily harm on another individual . . . , as manifested by acts or threats"); Ohio Rev. Code Ann. § 5122.01 (West 2022) ("Mentally ill person subject to court order" means a person who "[r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, [or] evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm . . . ."); Okla. Stat. Ann. tit. 43A, § 1-103 (West 2022) ("Person requiring treatment" means a person who "poses a substantial risk of immediate physical harm to another person or persons as manifested by evidence of violent behavior directed toward another person (Continued)

73

or persons . . . ."); 50 Pa. Stat. & Cons. Stat. Ann. § 7304 (West 2022) (determination of clear and present danger when there is "serious bodily harm to others"); 40.1 R.I. Gen. Laws Ann. § 40.1-5-2 (West 2022) ("Likelihood of serious harm" means a "substantial risk of physical harm to other persons as manifested by behavior or threats evidencing homicidal or other violent behavior . . . ."); S.C. Code Ann. § 44-23-10 (West 2022) ("Likelihood of serious harm" means "a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior and serious harm to them . . . ."); S.D. Codified Laws § 27A-1-1(7) (West 2022) ("Danger to others" means a "reasonable expectation that the person will inflict serious physical injury upon another person in the near future . . . ."); Tenn. Code Ann. § 33-6-501 (West 2022) (finding that an individual poses a "substantial likelihood of serious harm" when the individual "has threatened or attempted homicide or other violent behavior" or "has placed others in reasonable fear of violent behavior and serious physical harm to them"); Tex. Health & Safety Code Ann. § 574.034 (West 2022) (finding dangerousness of the individual "is likely to cause serious harm to others"); Utah Code Ann. § 62A-15-602 (West 2022) ("'Substantial danger' means that due to mental illness, an individual is at serious risk of . . . causing or attempting to cause serious bodily injury to another individual . . . ."); Vt. Stat. Ann. tit. 18, § 7101 (West 2022) (finding of dangerousness when it is established that an individual "has inflicted or attempted to inflict bodily harm on another" or "by his or her threats or actions he or she has placed others in reasonable fear of physical harm to themselves"); Va. Code Ann. § 37.2-817 (West 2022) (finding of dangerousness when "there is a substantial likelihood that, as a result of mental illness, the person will, in the near future, . . . cause serious physical harm to . . . others as evidenced by recent behavior causing, attempting, or threatening harm"); Wash. Rev. Code Ann. § 71.05.020 (West 2022) ("Likelihood of serious harm" means there is a substantial risk that "physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm . . . ."); W. Va. Code Ann. § 27-1-12 (West 2022) (finding of dangerousness if the "individual has inflicted or attempted to inflict bodily harm on another" or "by threat or action, has placed others in reasonable fear of physical harm to themselves"); Wis. Stat. Ann. § 51.20 (West 2022) (finding of dangerousness when there is "evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm"); Wyo. Stat. Ann. § 25-10-101 (West 2021) (finding of dangerousness when there is evidence of "a recent overt homicidal act, (Continued)

74

    **4.** ***The individual's behavior places others in reasonable fear of substantial bodily harm***;[19]

    **5.** ***The individual is unable to protect and care for himself, including inability to provide his basic physical needs***;[20]

---

attempt or threat or other violent act, attempt or threat which places others in reasonable fear of serious physical harm to them").

[19] Colo. Rev. Stat. Ann. § 27-65-102(10) (West 2022) ("Danger to the person's self or others' [includes] . . . evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt, or threat to do serious physical harm by the person in question."); Idaho Code Ann. § 66-317(10)(b) (West 2022) ("'Likely to injure himself or others' [includes] . . . [a] substantial risk that physical harm will be inflicted by the proposed patient upon another as evidenced by behavior . . . that places another person or persons in reasonable fear of sustaining such harm . . . ."); 405 Ill. Comp. Stat. Ann. 5/1-119(1) (West 2022) (finding of dangerousness when, "because of his or her illness, [he or she] is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing . . . another in . . . reasonable expectation of being physically harmed"); Me. Rev. Stat. Ann. tit. 34-B, § 3801(4-A) (West 2022) ("'Likelihood of serious harm' means: . . . [a] substantial risk of physical harm to other person as manifested by . . . recent conduct placing others in reasonable fear of serious physical harm."); Mass. Gen. Laws Ann. ch. 123, § 1 (West 2022) ("'Likelihood of serious harm', [means] . . . a substantial risk of physical harm to other persons as manifested by . . . evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them."); N.Y. Mental Hyg. Law § 9.01 (West 2022) ("'Likelihood to result in serious harm' or 'likely to result in serious harm' means a substantial risk of physical harm to other persons manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.").

[20] Alaska Stat. Ann. § 47.30.915(9)(A) (West 2022) ("'[G]ravely disabled' means a condition in which a person as a result of mental illness (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken . . . ."); Ariz. Rev. Stat. Ann. § 36-501(15) (West 2022) ("'Grave disability' means a condition evidenced by behavior in which a person, as a result of a mental disorder, is likely to come to serious physical harm or serious illness because the person is unable to provide for the person's own basic physical needs."); Ark. Code Ann. § 20-47-207(c)(2)(C) (West 2022) ("The person's recent behavior or behavior history demonstrates that he or she so lacks the capacity to care for his or her own welfare that there is a reasonable (Continued)

probability of death, serious bodily injury, or serious physical or mental debilitation if admission is not ordered . . . ."); Cal. Welf. & Inst. Code § 5008 (West 2022) ("For purposes of [Section 5250] 'gravely disabled' means a condition in which a person, as a result of impairment by chronic alcoholism, is unable to provide for his or her basic personal needs for food, clothing, or shelter."); Colo. Rev. Stat. Ann.§ 24-65-102(17) (West 2022) ("'Gravely disabled' means a condition in which a person, as a result of a mental health disorder, is incapable of making informed decisions about or providing for the person's essential needs without significant supervision and assistance from other people. As a result of being incapable of making these informed decisions, a person who is gravely disabled is at risk of substantial bodily harm, dangerous worsening of any concomitant serious physical illness, significant psychiatric deterioration, or mismanagement of the person's essential needs that could result in substantial bodily harm."); Conn. Gen. Stat. Ann. § 17a-495(b) (West 2022) ("For the purpose of [Section 17a-498] . . . 'gravely disabled' means that a person, as a result of mental or emotional impairment, is in danger of serious harm as a result of an inability or failure to provide for his or her own basic human needs such as essential food, clothing, shelter or safety . . . ."); Fla. Stat. Ann. § 394.467(1) (West 2022) ("He or she is incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and, without treatment, is likely to suffer from neglect or refuse to care for himself or herself, and such neglect or refusal poses a real and present threat of substantial harm to his or her well-being . . . ."); Ga. Code Ann. § 37-3-1(9.1) (West 2022) ("'Inpatient' means a person who is mentally ill and: . . . (A)(ii) Who is so unable to care for that person's own physical health and safety as to create an imminently life-endangering crisis . . . ."); Haw. Rev. Stat. Ann. § 334-1 (West 2022) ("'Dangerous to self' means the person recently has: . . . (2) Behaved in such a manner as to indicate that the person is unable, without supervision and the assistance of others, to satisfy the need for nourishment, essential medical care, including treatment for a mental illness, shelter or self-protection, so that it is probable that death, substantial bodily injury, or serious physical debilitation or disease will result unless adequate treatment is afforded."); Idaho Code Ann. § 66-317(12) (West 2022) ("'Gravely disabled' means the condition a person who, as the result of mental illness, has demonstrated an inability to: (a) Attend to basic personal needs, such as nourishment, or essential clothing, medical care, shelter or safety . . . ."); 405 Ill. Comp. Stat. Ann. 5/1-119(2) (West 2022) ("'Person subject to involuntary admission on an inpatient basis' means: . . . (2) A person with mental illness who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on an inpatient basis . . . ."); Ind. Code Ann. § 12-7-2-96 (West 2022) ("'Gravely disabled'", for purposes of [section] 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability (Continued)

76

to function independently."); Iowa Code Ann. § 229.1(20) (West 2022) ("'Seriously mentally impaired' or 'serious mental impairment' describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and . . . [i]s unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death . . . ."); Kan. Stat. Ann. § 59-2946(f)(3) (West 2022) ("'Likely to cause harm to self or others' means that the person, by reason of the person's mental disorder: . . . (B) is substantially unable, except for reason of indigency, to provide for any of the person's basic needs, such as food, clothing, shelter, health or safety, causing a substantial deterioration of the person's ability to function on the person's own."); Mass. Gen. Laws Ann. ch. 123, § 1 (West 2022) ("'Likelihood of serious harm,' [means] . . . a substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community."); Mich. Comp. Laws Ann. § 330.1401(1) (West 2022) ("'Person requiring treatment' means . . . an individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs."); Minn. Stat. Ann. § 253B.02 subd. 17a(a) (West 2022) ("A 'person who poses a risk of harm due to a mental illness' means any person who has [a mental illness] and who, due to this impairment, poses a substantial likelihood of physical harm to self . . . as demonstrated by . . . a failure to obtain necessary food, clothing, shelter, or medical care as a result of the impairment; [or] an inability for reasons other than indigence to obtain necessary food, clothing, shelter, or medical care as a result of the impairment and it is more probable than not that the person will suffer substantial harm, significant psychiatric deterioration or debilitation, or serious illness, unless appropriate treatment and services are provided."); Miss. Code Ann. § 41-21-61(f) (West 2022) ("'Person with mental illness' means any person who has a substantial psychiatric disorder . . . which . . . poses a substantial likelihood of physical harm to himself . . . as demonstrated by . . . a failure to provide necessary food, clothing, shelter or medical care for himself, as a result of the impairment."); Mo. Ann. Stat. § 632.005(10) (West 2022) ("'Likelihood of serious harm'" means . . . a substantial risk that serious physical harm to a person will result or is occurring because of an impairment in his capacity to make decisions with respect to his hospitalization and need for treatment as evidenced by his current mental disorder or mental illness which results in an inability to provide for his own basic necessities of food, clothing, shelter, safety or medical care or his inability to provide for his own mental health care which may result in a substantial risk of serious physical harm . . . [or] patterns of behavior [of the same previously occuring]."); Mont. Code Ann. § 53-21-126(1)(a) (West 2022) ("In determining whether the respondent requires commitment, . . . the court shall consider . . . whether the respondent, because of a mental disorder, is substantially unable (Continued)

77

to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety."); Neb. Rev. Stat. Ann. § 71-908 (West 2022) ("'Mentally ill and dangerous person' means a person who is mentally ill . . . and because of such mental illness . . . presents a substantial risk of serious harm to himself or herself within the near future as manifested by . . . evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety."); Nev. Rev. Stat. Ann. § 433A.0195 (West 2022) ("A person shall be deemed to present a substantial likelihood of serious harm to himself or herself . . . if . . . the person is at serious risk of . . . incurring a serious injury, illness or death resulting from complete neglect of basic needs for food, clothing, shelter or personal safety."); N.J. Stat. Ann. § 30:4-27.2 (West 2022) ("'Dangerous to self' means that by reason of mental illness the person has . . . behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future."); N.C. Gen. Stat. Ann. § 122C-3(11) (West 2022) ("'Dangerous to self' [means] . . . the individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety."); N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) ("Serious risk of harm" includes "[s]ubstantial deterioration in physical health, substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care . . . ."); Ohio Rev. Code Ann. § 5122.01 (West 2022) ("Mentally ill person subject to court order" means a person who "[r]epresents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community . . . ."); Okla. Stat. Ann. tit. 43A, § 1-103 (West 2022) ("Person requiring treatment" means a person who "poses a substantial risk of immediate serious physical injury to self or death as manifested by evidence that the person is unable to provide for and is not providing for his or her basic physical needs."); Or. Rev. Stat. Ann. § 426.005 (West 2022) (finding that involuntary commitment is warranted when the individual is "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm"); 50 Pa. Stat. & Cons. Stat. Ann. § 7304 (West 2022) (determination of clear and present danger when there is evidence of an "inability to care for himself, creating a danger of death or serious harm to himself"); S.C. Code Ann. § 44-23-10 (West 2022) ("Likelihood of serious harm" means "a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that the person is gravely disabled and that reasonable provision for the person's protection is not available in the community."); S.D. Codified Laws § 27A-1-1(7) (West 2022) (finding of dangerousness (Continued)

### 6. *The individual presents a danger to persons in his care, including inability to provide for their basic physical needs:*[21]

warranted when there has been demonstrated "an inability to provide for some basic human needs such as food, clothing, shelter, essential medical care, or personal safety"); Tex. Health & Safety Code Ann. § 574.034 (West 2022) (finding of dangerousness when an individual is "experiencing substantial mental or physical deterioration of the . . . ability to function independently, which is exhibited by the . . . inability, except for reasons of indigence, to provide for the . . . basic needs, including food, clothing, health, or safety"); Utah Code Ann. § 62A-15-602 (West 2022) ("'Substantial danger' means that due to mental illness, an individual is at serious risk of . . . serious bodily injury because the individual is incapable of providing the basic necessities of life, including food, clothing, or shelter . . . ."); Vt. Stat. Ann. tit. 18, § 7101 (West 2022) (finding of dangerousness warranted when it is established that an individual "has behaved in such a manner as to indicate that he or she is unable, without supervision and the assistance of others, to satisfy his or her need for nourishment, personal or medical care, shelter, or self-protection and safety, so that it is probable that death, substantial physical bodily injury, serious mental deterioration, or serious physical debilitation or disease will ensue unless adequate treatment is afforded"); Va. Code Ann. § 37.2-817 (West 2022) (finding of dangerousness warranted when "there is a substantial likelihood that, as a result of mental illness, the person will, in the near future, . . . suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs");Wash. Rev. Code Ann. § 71.05.020 (West 2022) ("Likelihood of serious harm" means an individual is "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety . . . ."); W. Va. Code Ann. § 27-1-12 (West 2022) (finding of dangerousness warranted if the "individual is behaving in a manner as to indicate that he or she is unable, without supervision and the assistance of others, to satisfy his or her need for nourishment, medical care, shelter or self-protection and safety"); Wis. Stat. Ann. § 51.20 (West 2022) (finding of dangerousness warranted when there is evidence that the individual is "unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment"); Wyo. Stat. Ann. § 25-10-101 (West 2022) (finding of dangerousness when there is evidence of an inability to "satisfy basic needs for nourishment, essential medical care, shelter or safety").

[21] Iowa Code Ann. § 229.1(20) (West 2022) ("'Seriously mentally impaired' or 'serious mental impairment' describes the condition of a person with mental illness [who] because of that illness . . . [i]s likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person . . . ."); Ky. Rev. Stat. Ann. § 202A.011(2) (West 2022) ("'Danger' or 'threat of danger to self, family, or others' means substantial physical harm or threat of substantial physical harm upon self, family, or others, including actions which deprive . . . family, or others of the basic means of survival including provision for reasonable shelter, food, or clothing."); (Continued)

79

*7.   The individual has impaired judgment;*[22]

*8.   The individual refuses or is unable to consent to voluntary treatment, including inability to recognize or understand his need for care;*[23]

---

Vt. Stat. Ann. tit. 18, § 7101 (West 2022) (finding of dangerousness by showing that "by his or her actions or inactions he or she has presented a danger to persons in his or her care"); W. Va. Code Ann. § 27-1-12 (West 2022) (finding of dangerousness when the "individual, by action or inaction, presents a danger to . . . others in his or her care").

[22] Alaska Stat. Ann. § 47.30.915(9)(B) (West 2022) ("'[G]ravely disabled' means a condition in which a person as a result of mental illness . . . (B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently . . . ."); Idaho Code Ann. § 66-317(11) (West 2022) ("'Mentally ill' means a condition resulting in a substantial disorder of thought, mood, perception, or orientation that grossly impairs judgment, behavior, capacity to recognize and adapt to reality and requires care and treatment at a facility or through outpatient treatment."); Ind. Code Ann. § 12-7-2-96 (West 2022) ("'Gravely disabled', for purposes of [section] 12-26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because . . . [of] a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently."); N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) (looking at "[e]vidence of objective facts to establish the loss of cognitive or volitional control over the individual's thoughts or actions" when determining dangerousness); Wash. Rev. Code Ann. § 71.05.020(24) (West 2022) (finding of "grave disability" when the individual "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions"); Wis. Stat. Ann. § 51.20(1) (West 2022) (considering evidence of "impaired judgment" when determining dangerousness).

[23] Ala. Code § 22-52-10.4(a)(4) (West 2022) ("Respondent is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable."); Alaska Stat. Ann. § 47.30.755(b) (West 2022) ("If the court finds . . . that the respondent has been advised of and refused voluntary treatment through the alternative, the court may order the less restrictive alternative treatment . . . ."); Ariz. Rev. Stat. Ann. § 36-540 (West 2022) ("If the court finds . . . [the individual] . . . is either unwilling or unable to accept voluntary treatment, the court shall order the patient to undergo . . . (1) . . . outpatient treatment, (2) . . . combined inpatient and outpatient treatment, [or] (3) inpatient treatment in a mental health treatment agency . . . [or] in a hospital . . ."); Ark. Code Ann. (Continued)

80

§ 20-47-207(c)(2)(D)(i) (West 2022) ("The person's understanding of the need for treatment is impaired to the point that he or she is unlikely to participate in treatment voluntarily . . . ."); Cal. Welf. & Inst. Code § 5250(c) (West 2022) ("The person has been advised of the need for, but has not been willing or able to accept, treatment on a voluntary basis."); Conn. Gen. Stat. Ann. § 17a-495(b) (West 2022) ("Gravely Disabled" includes that "hospital treatment is necessary and available and [the individual] is mentally incapable of determining whether or not to accept such treatment because his judgment is impaired by his psychiatric disabilities."); Del. Code Ann. tit. 16, § 5011(a)(4) (West 2022) ("The individual has declined voluntarily inpatient treatment, or lacks the capacity to knowingly and voluntarily consent to inpatient treatment. When evaluating capacity, the court shall consider an individual's ability to understand the significant consequences, benefits, risks, and alternatives that result from the individual's decision to voluntarily request or decline inpatient treatment."); Fla. Stat. Ann. § 394.467(1) (West 2022) ("A person may be ordered for involuntary inpatient placement for treatment upon a finding . . . that: (a) He or she has a mental illness and because of his or her mental illness: (1.a.) He or she has refused voluntary inpatient placement for treatment after sufficient and conscientious explanation and disclosure of the purpose of inpatient placement for treatment;  or (b.) He or she is unable to determine for himself or herself whether inpatient placement is necessary . . . ."); Idaho Code Ann. § 66-317(10)(c) (West 2022) ("The proposed patient lacks insight into his need for treatment and is unable or unwilling to comply with treatment . . . ."); *id.* § 66-317(12) ("'Gravely disabled' means a person who, as the result of mental illness, is: . . . [unable to] (d) [r]ecognize that he is experiencing symptoms of a serious mental illness and lacks insight into his need for treatment and is unable or unwilling to comply with treatment . . . ."); 405 Ill. Comp. Stat. Ann. 5/1-119(3) (West 2022) ("A person with mental illness who: (i) refuses treatment or is not adhering adequately to prescribed treatment;  (ii) because of the nature of his or her illness, is unable to understand his or her need for treatment . . . ."); Iowa Code Ann. § 229.1(20) (West 2022) ("'Seriously mentally impaired' or 'serious mental impairment' describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment . . . ."); Kan. Stat. Ann. § 59-2946(f) (West 2022) ("(1) 'Mentally ill person subject to involuntary commitment for care and treatment' means a mentally ill person, . . . who also lacks capacity to make an informed decision concerning treatment . . . . (2) 'Lacks capacity to make an informed decision concerning treatment' means that the person, by reason of the person's mental disorder, is unable, despite conscientious efforts at explanation, to understand basically the nature and effects of hospitalization or treatment or is unable to engage in a rational decision-making process regarding hospitalization or treatment, as evidenced by an inability to weigh the possible risks and benefits."); Md. Code Ann., Health-Gen. § 10-632(e)(2) (West 2022) ("The hearing officer shall . . . [o]rder the release of the individual . . . unless . . . the individual is unable or unwilling to be voluntarily admitted to the facility."); Mich. Comp. Laws Ann. § 330.1401(1) (West 2022) (Continued)

81

9.  *The individual has a history of mental illness, including prior treatment and hospitalization;*[24]

("'Person requiring treatment' means . . . an individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary."); N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) (looking at "the effect of the individual's mental condition on the individual's ability to consent" when determining dangerousness); Ohio Rev. Code Ann. § 5122.01 (West 2022) (considering whether "as a result of the person's mental illness," the individual "is unlikely to voluntarily participate in necessary treatment"); S.C. Code Ann. § 44-17-580 (West 2022) (allowing involuntary commitment if the individual "lacks sufficient insight or capacity to make responsible decisions with respect to his treatment"); Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(iii) (West 2022) (considering whether the individual is "unable to make a rational and informed decision as to whether or not to submit to treatment" when determining dangerousness); Utah Code Ann. § 62A-15-631(16)(a)(iii) (West 2022) (considering whether the individual "lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible risks of accepting or rejecting treatment" when determining whether involuntary commitment is appropriate).

[24] N.D. Cent. Code Ann. § 25-03.1-02 (West 2022) (looking at "patterns in the individual's treatment history" when determining if there is a "serious risk of harm"); Okla. Stat. Ann. tit. 43A, § 1-103 (West 2022) ("The mental health or substance abuse history of the person may be used as part of the evidence to determine whether the person is a person requiring treatment . . . ."); Or. Rev. Stat. Ann. § 426.005 (West 2022) ("Person with mental illness" means a person "[w]ho, within the previous three years, has twice been placed in a hospital or approved inpatient facility" or "[w]ho is exhibiting symptoms or behavior substantially similar to those that preceded and led to one or more of the hospitalizations . . . ."); S.D. Codified Laws § 27A-1-1 (West 2022) (looking at a "person's treatment history" when considering if the individual is a danger to self or others); Va. Code Ann. § 37.2-817 (West 2022) (looking at "any past mental health treatment of the person" and "any health records available" when determining dangerousness); W. Va. Code Ann. § 27-1-12(b) (West 2022) ("In making the 'likely to cause serious harm' determination, . . . decisionmakers should utilize all available information, including psychosocial, medical, hospitalization and psychiatric information and including the circumstances of any previous commitments or convalescent or conditional releases that are relevant to a current situation . . . ."); Wyo. Stat. Ann. § 25-10-101 (West 2022) (allowing a court to "consider a person's mental health history in determining" dangerousness).

82

***10. The individual has a history of noncompliance with mental health treatments;***[25]

***11.        The individual's need for treatment cannot be adequately addressed by family, available community programs, or less-restrictive treatment alternatives;***[26] and

---

[25] Ark. Code Ann. § 20-47-207(c)(2)(D)(iii) (West 2022) ("'[A] clear and present danger to himself or herself' is established by demonstrating that: . . . (D)(iii) [t]he person's noncompliance with treatment has been a factor in the individual's placement in a psychiatric hospital, prison, or jail at least two (2) times within the last forty-eight (48) months or has been a factor in the individual's committing one (1) or more acts, attempts, or threats of serious violent behavior within the last forty-eight (48) months."); 405 Ill. Comp. Stat. Ann. 5/1-119 (West 2022) ("'Person subject to involuntary admission on an inpatient basis' means: . . . (3) A person with mental illness who: (i) refuses treatment or is not adhering adequately to prescribed treatment; (ii) because of the nature of his or her illness, is unable to understand his or her need for treatment; and (iii) if not treated on an inpatient basis, is reasonably expected, based on his or her behavioral history, to suffer mental or emotional deterioration . . . ."); Ohio Rev. Code Ann. § 5122.01 (West 2022) ("Mentally ill person subject to court order" means that the person "would benefit from treatment as manifested by evidence" that the "person has a history of lack of compliance with treatment for mental illness . . . .").

[26] Alaska Stat. Ann. § 47.30.755(b) (West 2022) ("If the court finds that there is a less restrictive alternative available . . . the court may order the less restrictive alternative treatment . . . ."); Ariz. Rev. Stat. Ann. § 36-540(B) (West 2022) ("The court shall order the least restrictive treatment available."); Cal. Welf. & Inst. Code § 5250(d) (West 2022) ("(1) [A] person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter. (2) However, unless they specifically indicate in writing their willingness and ability to help, family, friends, or others shall not be considered willing or able to provide this help."); Conn. Gen. Stat. Ann. § 17a-498(c)(3) (West 2022) ("[T]he court shall make an order for his or her commitment, considering whether or not a less restrictive placement is available . . . ."); Del. Code Ann. tit. 16, § 5011(a) (West 2022) ("An individual shall be involuntarily committed for inpatient treatment only if . . . (3) All less restrictive alternatives have been considered and determined to be clinically inappropriate at the time of the hearing . . . ."); D.C. Code Ann. § 21-545(b)(2) (West 2022) ("[T]he Court may order the person's commitment to the Department or to any other facility, hospital, or mental health provider that the Court believes is the least restrictive alternative consistent with the best interests of the person and the public."); Fla. Stat. Ann. § 394.467(1) (West 2022) ("A person may be ordered for involuntary inpatient placement for treatment upon a finding . . . that: . . . (b) All available less restrictive treatment alternatives that would offer an opportunity for improvement of his or her condition have been judged to be (Continued)

83

12.     ***The individual has a history of committing, or has recently committed, dangerous overt acts or has exhibited grossly disturbed behavior or harmful sexual conduct.*[27]**

---

inappropriate."); Haw. Rev. Stat. Ann. § 334-60.2(3) (West 2022) (A court must find "[t]hat the person is in need of care or treatment, or both, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization."); Idaho Code Ann. § 66-329(11) (West 2022) ("If, upon completion of the hearing and consideration of the record, and after consideration of reasonable alternatives . . . , the court finds . . . [commitment is appropriate under this section], the court shall order the proposed patient committed . . . ."); Me. Rev. Stat. Ann. Tit. 34-B § 3864(6)(A) (West 2022) ("The District Court shall so state in the record . . . clear and convincing evidence that the person is mentally ill and that the person's recent actions and behavior demonstrate that the person's illness poses a likelihood of serious harm; that adequate community resources for care and treatment of the person's mental illness are unavailable; [and] that inpatient hospitalization is the best available means for treatment of the patient."); Neb. Rev. Stat. Ann. § 71-925(1) (West 2022) ("The state has the burden to prove by clear and convincing evidence that (a) the subject is mentally ill and dangerous and (b) neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the mental health board are available or would suffice to prevent the harm.").

[27] Del. Code Ann. tit. 16, § 5001(3), (4) (West 2022) (The determinations of whether an individual is "dangerous to others" and "dangerous to self" both "take into account a person's history, recent behavior and any recent act or threat"); Colo. Rev. Stat. Ann. § 27-65-102(10)(a), (b) (West 2022) (The "danger to the person's self or others" inquiry considers "evidence of recent homicidal or other violent behavior by the person in question"); Ga. Code Ann. § 37-3-1(9.1) (West 2022) ("'Inpatient' means a person who is mentally ill and: (A)(i) Who presents a substantial risk of imminent harm to that person or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person or other persons . . . ."); Miss. Code Ann. § 41-21-61(f) (West 2022) ("'Person with mental illness' means any person who has a substantial psychiatric disorder . . . which is manifested by instances of grossly disturbed behavior or faulty perceptions."); Mo. Ann. Stat. § 632.005(10) (West 2022) (The determination of "likelihood of serious harm" to another person considers "recent overt acts, behavior or threats, including verbal threats, which have caused such harm or which would place a reasonable person in reasonable fear of sustaining such harm. Evidence of that substantial risk may also include information about patterns of behavior that historically have resulted in physical harm previously being inflicted by a person upon another person."); Utah Code Ann. § 62A-15-602 (West 2022) ("'Substantial danger' means . . . an individual is at serious risk of . . . 'engaging in harmful sexual conduct.'").

84

In order to illustrate how difficult a factoring analysis has become as the science has advanced, we have assembled the following list of risk predictors from the preceding discussion (1) concerning continuing scientific, clinical observation and analysis, (2) from the state sovereigns, and (3) from *Ecker* and similar sources:

| | |
|---|---|
| Substance abuse history | Minimizing prior violent actions |
| Target identification | History of or mentioning suicide |
| Weapon use and availability | Self-harm activity or threats |
| Incidents of unsafe behavior | The justified fears of others |
| Refusing or forgetting medication | Family member opinions |
| Refusing or forgetting treatment | Friend and fellow committee views |
| Delusions | Inability to protect or care for self |
| Violent history | Same, as to persons in his or her care |
| Arrest history, especially in youth | Impaired judgment |
| Prior fire setting activity | Refusal to access medical care |
| Animal cruelty | Refusal to access psychiatric care |
| Unusual risk taking | Inability to self-assess for treatment |
| Impulsivity | Mental illness type and history |
| Impaired current mental state | Family support |
| Provocative mate or caregiver | Alternative treatment programs |
| Non-protective mate or caregiver | Absence of less-restrictive options |
| Viewing oneself as a victim | Inadequate available alternatives |
| Lack of compassion or empathy | Grossly disturbed behavior |
| Harmful intent | Sexual misconduct |

This rather unmanageable inventory illustrates why a rigid resort to factoring has become impracticable. Instead, the district court's inquiry must have sufficient play in the joints. In some cases, one or more of the factors may be worthy of development and discussion. In other cases, more emphasis might instead be placed on statistical and actuarial risk predictors developed through expert reports or testimony. In yet other cases,

85

the necessity of revocation or continued supervision may be so apparent that the hearing and the district court's supporting findings might be justifiably brief. But the irreducible minimum is a thorough and well-supported explanation by the district court of what Congress required: a reasoned and logical linkage between the individual's failure to comply with the conditions of his discharge on the one hand with the finding on the other that "his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another."

And we stress the discretionary determination of the necessary effort to be devoted to developing that linkage depends heavily upon counsel surfacing an appropriate documentary record in advance of the revocation hearing. It is not the district court's obligation to discern and develop the factors, statistical risk predictors, or other factual parameters bearing on the individualized inquiry. Instead, the district court should expect counsel and the facility professionals to appropriately develop the matter prior to, and then, if necessary, during the hearing. And if they default, the district court should direct them to drill down and perform their due diligence. The district court will then be well positioned to make the discretionary call as to the complexity – or simplicity – of the proceedings necessary to discharge its statutory obligation.

That process did not occur here. First, counsel utterly failed to furnish the district court with a documentary record required for this committee. Second, the district court failed to require more. Our review of the record leaves much room for speculation where none should exist. What we have in this case is a very brief, repetitive, and gap-filled record

86

for a committee with serious, long-term mental challenges who has twice failed conditional release over his decade-and-a-half hospitalization and treatment.

Mr. Perkins underwent many years of treatment, with both promising and extremely concerning developments along the way. And Mr. Perkins' case should certainly have been more fully developed and intensely scrutinized. According to his July 1, 2013, Annual Risk Assessment, he showed "no symptoms of psychopathology until 1999," after suffering that year a "severe" beating which resulted in the perpetrator's incarceration. J.A. at 190. After that traumatic event, he developed "increased mistrust of others and 'an interest in politics.'" *Id.* He believed he was entitled to compensation for his injuries and, when recompense was denied, "he engaged in behaviors that were indicative of serious disorganization and severe mental illness." *Id.* He regularly carried a firearm, and, of significant concern, his delusional thoughts centered on a sitting United States congressman. He contacted the congressman's family "numerous times in 2000, 2003, 2004, and 2007," culminating in Mr. Perkins' arrest that same year for threatening to kill the congressman. *Id.*

Once hospitalized under § 4241, his condition "fluctuated," with hypomania, disorganized thinking, inappropriate laughter, loud singing and racial slurs. *Id.* at 193. Following his hospitalization under § 4246 in 2009 -- in the months preceding his 2010 conditional release -- he yet demonstrated "poor insight into his mental illness." *Id.* at 194. And then he was conditionally released. Unsurprisingly, that release was brief, with his return to FMC Butner later in 2010. Among other concerning behaviors exhibited during his return to hospitalization was "an erotomanic fixation" with one of his treating

87

physicians, along with a hope that "President Obama and Hillary Clinton would 'burn in hell.'" J.A. at 196.

The Risk Panel Assessments in the years following are quite repetitive, but they give rise to similar concerns repeatedly, culminating in the June 19, 2017, letter to the district court from the FMC Butner Acting Warden referencing an attached June 1, 2017, Annual Risk Assessment and stating: "It is the opinion of our mental health staff that Mr. Perkins continues to suffer from a mental disease or defect such that his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." J.A. at 239.

Just months later, however, on March 6, 2018, the United States Attorney filed a "CERTIFICATE OF IMPROVED MENTAL CONDITION AND REQUEST FOR CONDITIONAL RELEASE [('Certificate')]." J.A. at 60. In support of the conditional release request, the Certificate inexplicably references *a November 30, 2017, "annual forensic risk assessment"* – nowhere found in the record on appeal – with no mention of its starkly contrasting predecessor Annual Risk Assessment mentioned above which was filed just five months earlier on June 1, 2017. *Id.* Upon receipt of the March 6, 2018, Certificate, the district court then conditionally released Mr. Perkins the next day.

Again, Mr. Perkins was apprehended on a warrant issued months later on February 6, 2019, following his (1) refusal to follow Fern Terrace rules, (2) repeatedly failing to maintain his GPS monitor, resulting in false alerts, (3) refusing to meet with his psychiatrist and take prescribed medications, and (4) failing to receive permission before leaving the district. In view of this rather complex thumbnail sketch, and whether the district court

88

chose revocation, continued release, or a modification of conditions, we lack the thorough and considered linkage required by Congress that permits us to review the determination.

Although we do not prescribe a set of requirements, this troubling record suggests the seriousness of the matter and the inadvisability of simply adopting a facility director's recommendation, whether on the matter of conditional release or its revocation:

> [T]he whole idea of a hearing on conditional release implies that the opinion of the director of the treating facility is not necessarily the last word; otherwise, the statute would have left such decisions entirely in the director's hands. *Other experts might testify, and the court would be entitled to consider any relevant lay testimony*.

*United States v. Jain*, 174 F.3d 892, 898 (7th Cir. 1999) (emphasis added).

In those limited cases where a hearing and a very thorough inquiry is warranted upon revocation or conditional release thereafter, the district court has multiple arrows in its quiver to assure it is exquisitely well informed and able to adequately explain its decision. For example, it will have the record developed during the § 4246(b) civil commitment process and the annual Risk Panel Assessments. Furthermore, § 4246 authorizes the district court to order the comprehensive psychiatric examination and reporting contemplated by 18 U.S.C. § 4247(b) and (c). Additionally, the district court and the parties will also possess the examination and reporting leading to the § 4246(e) conditional discharge determination.

Following the receipt of this information, perhaps supplemented by any helpful actuarial risk assessment information supplied by the expert(s), the district court may then conduct the revocation hearing and explain in the record, *inter alia*, why it deems the

89

subject's "continued release would" or would not "create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(f).

For example, if a conditionally released individual is homeless, suffering from schizophrenia, exhibiting paranoia, refusing to take his psychotropic medication, and avoiding further psychiatric evaluation, the dots are readily connected with little in the way of explanation. Alternatively, if the individual is continuing his medication and outpatient psychiatric care but has missed a single appointment with his probation officer and is between jobs, more depth would be required for a district court's findings that the defaulted conditions give rise to dangerousness and hence revocation.

Furthermore, the need for a lengthy hearing and expert testimony will doubtless arise only infrequently. For the ten-year period from August 2012 to August 2022, only 353 conditional discharge cases were closed nationwide. Of those -- again on a *nationwide* basis -- only 97 conditional discharges were revoked. By comparison, there were 450,459 supervised release cases closed during the same period, with 149,304 resulting in at least one revocation hearing. Further, there is no indication that our Circuit has a disproportionate share of conditional discharge or revocation cases, despite FMC Butner

90

falling within our boundaries.[28] For the same ten-year period noted above, there were only 43 conditional discharge cases closed in our Circuit, with only 20 resulting in revocation.[29]

Irrespective of the work required, however, much hangs in the balance when the § 4246(f) dangerousness determination pends. As noted, in the event a high-risk individual is released amiss, he or she may wreak havoc until apprehended; alternatively, if a revoked individual is restored and eligible for conditional discharge anew, her continued incarceration, without a sound, current, and scientific basis, is both an unnecessary and intolerable restraint of personal liberty, not to mention an unwarranted burden on the fisc.

## VI.

Under the standards we have established today, a district court may now revoke conditional discharge upon finding by a preponderance of the evidence that (1) the individual failed to comply with his treatment regimen, including all conditions reasonably

[28] FMC Butner "serves as a major medical and psychiatric referral center for male inmates." Dep't of Justice, Fed. Bureau of Prisons, *Legal Resource Guide to the Federal Bureau of Prisons* 28 (2019). There are three other "major . . . psychiatric referral center[s]" in the United States, namely, FMC Carswell (Fort Worth, Texas), FMC Rochester (Rochester, Minnesota), and, as noted, USMCFP Springfield (Springfield, Missouri). *Id.* at 28–29.

[29] The data points are freely available to federal probation offices nationwide. Unfortunately, the statistics are not readily available otherwise. One commentator has observed that "[a]lthough civil commitment is practiced across the United States, basic statistics about these policies, such as the numbers of involuntary psychiatric hospitalizations each year, remain unknown or inaccessible to much of the public." Nathaniel P. Morris, M.D., *Detention Without Data: Public Tracking of Civil Commitment*, 71 Psychiatric Servs. 741, 741 (2020) (noting "there is no federal database that tracks the number of patients who are committed against their will to psychiatric units each year. . . . Given the loss of liberty, the personal distress, and the stigma involved, this lack of data is astounding." (cleaned up)).

related thereto, and that, in light of that failure, (2) his continued release would create a substantial risk of bodily injury to another. We note that "district courts generally are accorded great latitude when determining whether a mentally ill defendant is ready to be released and under what conditions." *Jain*, 174 F.3d at 898; *United States v. Weed*, 389 F.3d 1060, 1071–72 (10th Cir. 2004) ("Our role on clear error review is not to re-weigh the evidence; rather, our review of the district court's finding is significantly deferential." (cleaned up)). But the district court's finding(s) in support of revocation, or permitting continued conditional release (with or without modified conditions), must, as we have noted, contain a reasoned and logical linkage of the statutory questions sufficient for us to perform our obligations on review.

The record is unclear whether the district court's findings were made by a preponderance of the evidence. It also appears from the record that the district court collapsed both inquiries of § 4246(f) into a single question, focusing only on whether Mr. Perkins violated conditions of his release and not explaining why "in light of" those violations his continued release created a substantial risk to other persons or property. Additionally, the record would benefit from further development respecting the violations alleged and the available, recent records from the facility. For example, the government during argument before the district court noted that (1) Mr. Perkins believes that his civil commitment is illegal because he has never engaged in threatening behavior, (2) he would potentially be homeless if released, (3) he failed to meet with his psychiatrist for a period of months, (4) he is verbally abusive to staff at his facility, and (5) he will not maintain his

92

GPS locator. If that evidence is admitted and credited by the district court, it would give rise to serious risk assessment concerns.

On the other hand, we note the government stated as well during argument before the district court that "he cannot miss doses. His condition is such that missing a dose can have serious impacts. . . . And so missing two doses is going to have a detrimental effect." J.A. at 133. The medication prescribed, how often it was missed, and the effect of the missed medications is not a matter for argument. Instead, the government should take note of its evidentiary burden, develop evidence on the point, and provide the district court a sound basis for making reasoned findings on the matter of dangerousness for that particular, alleged violation. Further, at a minimum, the recent, noncontradictory input from the Risk Panel would be exceptionally helpful.

## VII.

Respecting the proof standard, our learned, concurring colleague offers a much briefer discussion. The fulcrum of his analysis is the "internal logic of" § 4246. *See Lockhart v. United States*, 577 U.S. 347, 352 (2016). The thoughtful approach he offers works quite well for purposes of both §§ 4246(d) and 4246(e). But that same internal logic inevitably collides with § 4246(f). It simultaneously demonstrates the necessity of the considerable effort we devoted to surfacing and resolving the issues presented.

As noted, Congress specified textually in § 4246 a high proof standard in subsection (d), a lower proof standard in subsection (e), and no proof standard whatsoever in subsection (f). We must thus reckon with at least two questions as we go about the task of

93

interpreting § 4246(f). First, did Congress -- by its silence -- leave a crevice within which the Judiciary might insert the preponderance standard for subsection (f) determinations? Second, if it did not do so, did it leave us to guess about the applicable proof standard? The concurring opinion answers the first question in the affirmative and necessarily sidesteps the second. In contrast, our research conclusively answers both questions in the negative. We eventually reach the same result as our good colleague, but by radically different approaches. Our parting of analytical ways might ordinarily be the end of the matter. But it is not in this instance, at least if we wish to arrive at the right result in the right way -- and simultaneously avoid a criticism that we have not given due regard to the Article I legislature.

Respecting the first question, the concurring opinion is on very shaky interpretive ground suggesting Congress in 1984 silently permitted -- or implicitly chose -- the preponderance standard. As noted, the preponderance standard urged by our colleague was unceremoniously jettisoned by Senate and House Conferees just two days preceding congressional passage and the President's signature. As noted *supra*, the striking of that proof standard during Conference is a drafting event of significant moment; it also restrains us from substantive reinsertion by nominal interpretation:

> "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also Muniz v. Hoffman*, 422 U.S. 454, 468 (1975) (explaining that statutory text "may not be read isolated from its legislative history and the revision process from which it emerged, all of which place definite limitations on the latitude we have in construing it.").

94

*Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 927 (4th Cir. 2022); *see also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) ("The Conference Committee . . . deleted this 'effects on commerce' provision, leaving only the 'in commerce' language of s 2(a). . . . [I]ts action strongly militates against a judgment that Congress intended a result that it expressly declined to enact.") (cited in *Campbell v. McCarthy*, 952 F.3d 193, 205 n.10 (4th Cir. 2020) (King, J.)); *Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir. 1986) ("Inasmuch as the conference report represents the final statement of terms agreed upon by both houses of Congress, next to the statute itself, it is the most persuasive evidence of Congressional intent behind the enactment of a statute.") (cleaned up); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 881 (4th Cir. 1996) ("In this circuit, conference reports are the most persuasive evidence of legislative intent, after the statute itself.").

Respecting the second question, Congress did not leave us guessing about the applicable proof standard. It is for this reason, if no other, that our lengthy discussion leading up to and including Section V.A.3 is so essential in our view. As there discussed, Congress (1) explicitly analogized conditional release to the decades-old sentence of probation, (2) left the revocation proof standards for both unstated in enacting the 1984 CCCA, and (3) thus left undisturbed the then well-settled, existing "reasonably satisfied" standard as to probation revocation, with the same standard thereafter to govern revocation of conditional release. If we had failed to illuminate the fact that the "reasonably satisfied" probation revocation standard *originated* with the Article III Judiciary long before enactment of the 1984 CCCA -- and thus then gradually and permissibly morphed

95

judicially once again into the preponderance probation revocation standard across the circuits in the years following -- we might erroneously be perceived as substituting our judgment for that of the Article I legislature in 1984 -- and thereby imposing a newly minted proof standard Congress rejected during Conference.[30] That is a criticism we would just as soon avoid.

We likewise differ with our concurring colleague's objection to our use of information outside the record. While he does not cite the sources giving rise to that challenge, we detect no difficulty. None of the authorities we reference are beyond our permissible reach. Fed. R. Evid. 201 cmt. ("Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the

---

[30] The concurring opinion cites "the only circuit court of appeals to address this issue in a published decision. *Sealed Appellee v. Sealed Appellant*, 665 F.3d 620 (5th Cir. 2011)." But *Sealed Appellee* notes just the opposite. The panel observed the parties were not in controversy on the proof standard. *Id.* at 623 ("[W]e hold that the fair preponderance of evidence standard, *not challenged as the standard appropriate to decide whether the violative conduct occurred*, also applies to the twin finding of a substantial risk of harm.") (emphasis added). The concise three-page opinion devotes but a few sentences to the statutory text. It is thus of little assistance. It does, however, illustrate, like other decisions we noted *supra*, that no court has yet been willing to undertake the difficult statutory interpretation question here presented.

Neither are we persuaded that *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983), and similar cases materially aid the inquiry. While we are, as the concurring opinion cogently observes, dealing with a civil commitment matter, there is a vast gulf between that matter and ordinary civil litigation. The securities fraud and gender discrimination controversies cited in the concurring opinion are matters of significance. But they are not meaningful comparators to cases such as this one, which began with serious threats against a congressman and his family by an individual with serious mental challenges, with that individual hanging in the balance between indefinite confinement and conditional freedom. We thus disagree with the notion this atypical case is a neat match for the usual civil procedural rules and standards otherwise applicable.

formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."); *see* Brenda C. See, *Written in Stone? The Record on Appeal and the Decision-Making Process*, 40 Gonz. L. Rev. 157, 191 (2005) ("'Legislative' facts concern matters which relate to what is known as the 'legislative' function of the court, where the court is in essence 'making law' either by filling a gap in the common law by formulating a rule, construing a statute, or framing a constitutional rule.") (quoting Edward J. Imwinkelried, *Expert Testimony By Ethicists: What Should Be the Norm?*, 76 Temp. L. Rev. 91, 114 (2003)); Kenneth Culp Davis, *An Approach to the Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 406 (1942); See, *supra*, at 196 & n.346 (quoting a separate study of Supreme Court decisional law and observing "from 1991 forward there has been a 'substantial and continuing increase in the [Supreme] Court's citation of nonlegal sources' and further noting "non-legal citations consisted of secondary materials other than cases, constitutional provisions, legal treatises, law reviews, governmental documents, and standard compilations of legislative and constitutional history. Thus, the set of non-legal citations consists largely of citations to history, political science, economics, and other non-legal academic journals, to newspapers and popular periodicals, to dictionaries and encyclopedias, to books of history, politics, and the like, and occasionally to poetry, plays, and literature.") (quoting Frederick Schauer & Virginia J. Wise, *Legal Positivism as Legal Information*, 82 Cornell L. Rev. 1080, 1110 n.92 (1997)).

Our very limited resort to history and settled psychiatric science pales by comparison to the outside research performed -- and exotic sources consulted -- at the highest level of the Judiciary. Allison Orr Larsen, *Confronting Supreme Court Fact Finding*, 98 Va. L. Rev. 1255, 1261–62 (2012) ("Justice Breyer is not apologetic for his independent research and he is not alone. Justice Alito, who concurred in the result of [*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011),] but disagreed with affording First Amendment protection to these video games, peppered his opinion with citations to websites (like slashgear.com and popularmechanics.com), touting the 'astounding' violence, 'antisocial theme,' and 'interactive nature' of these video games. His opinion, in fact, prompted Justice Scalia to criticize Alito for his 'considerable independent research.' And not to be outdone, Justice Thomas's dissent in the same case cites fifty-nine sources to establish the fact that the Founding generation believed parents had complete authority over their children's development. Fifty-seven of those sources cannot be found in the briefs -- party briefs or amicus briefs -- and were thus the product of in-house research."); *id.* at 1276–77 ("Several of the sources Justice Scalia uses in *District of Columbia v. Heller* to set forth the history of the language of the Second Amendment were drawn from outside of the party briefs or the hundreds of amicus briefs filed in that case. . . . Once again the Justices who rely extensively on such in-house research cannot be identified by the politics of the President who appointed them. Examples of such extensive in-house fact finding include: Justice Kennedy's opinion for the Court in *Graham v. Florida*, Justice Alito's majority opinion in *McDonald v. City of Chicago*, Justice Ginsburg's dissent in *Gonzales v. Carhart*, Justice Thomas's concurrence

98

in *Safford Unified School District No. 1 v. Redding*, Justice Scalia's concurrence in *Citizens United v. FEC*, and Justice Breyer's dissents in *Free Enterprise Fund v. Public Company Accounting Oversight Board* and *Parents Involved in Community Schools v. Seattle School District No. 1*. In-house fact finding is thus not a rarity in any sense of the word. It happens in many cases, can be found in opinions from many Justices, and can account for a substantial percentage of the factual citations in any one opinion.").

These differences aside, we are grateful to our colleague for joining the result reached.

## VIII.

Based upon the foregoing discussion, we vacate the district court's order and remand for further proceedings consistent with the foregoing discussion.

*VACATED AND REMANDED*

AGEE, Circuit Judge, concurring in the judgment:

I agree with the majority that 18 U.S.C. § 4246(f) requires the determination to revoke conditional discharge to be based upon a preponderance of the evidence and that the district court's discussion fell short of making the requisite findings to revoke Perkins' conditional discharge. For that reason, I concur in the decision to vacate the district court's order and remand the case for further proceedings. I write separately, however, because the majority opines at length on matters unnecessary to resolve the case before us and which are not contained in the record.

I.

The first issue before the Court is whether § 4246(f)'s revocation-of-conditional-discharge determination must be based on a preponderance-of-the-evidence or a clear-and-convincing-evidence standard. Like the majority, I conclude that the preponderance-of-the-evidence standard applies. I reach this conclusion because neither the Constitution nor the statute requires a heightened degree of proof and the default degree of proof in civil cases—a preponderance—is appropriate. In doing so, I agree with the only circuit court of appeals to address this issue in a published decision. *Sealed Appellee v. Sealed Appellant*, 665 F.3d 620 (5th Cir. 2011).[1] For these reasons, elaborated on below, I agree that a district court

---

[1] Perkins points to a later Fifth Circuit decision to contend that it "suggest[ed]" the clear-and-convincing-evidence standard should apply. That case, *United States v. Mitchell*, 709 F.3d 436 (5th Cir. 2013), does not apply. Looking at a different, albeit identical, statutory provision regarding revocation of discharge for persons found not guilty by reason of insanity (§ 18 U.S.C. § 4243(g)), *Mitchell* did not resolve the issue of the degree (Continued)

must make the requisite findings to revoke conditional discharge under subsection (f) by a preponderance of the evidence.

Turning first to the statute: section 4246 sets out the procedure for civilly committing an individual who, along with other criteria, is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." § 4246(a). The first four subsections of the statute discuss the procedures and criteria for an initial commitment. § 4246(a)–(d). Subsection (d) specifies that the district court's factual findings must be made using the clear-and-convincing-evidence standard: the district court must "find[] by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." Subsection (e) specifies the procedures and criteria for discharge and conditional discharge from civil commitment, requiring that the court make its findings "by a preponderance of the evidence." Subsection (f) addresses when a district court may revoke conditional discharge,

---

of proof required, determining that even under the higher standard, the record supported the district court's findings. *Id.* at 443.

The majority takes issue with my recognition that *Sealed Appellee* also rejected the clear-and-convincing-evidence standard in favor of a preponderance-of-the-evidence one. *Ante* at 96 n.30. That decision *did* "hold" that the district court appropriately used the preponderance-of-the-evidence standard when assessing whether to revoke conditional discharge under § 4246(f). 665 F.3d at 622–23. Although the parties did not challenge the standard specifically applicable to the part of that inquiry relating to whether a violation occurred, that does not alter the court's statutory analysis. *See id.* at 623. More to the point, no circuit court has held that a higher standard applies to § 4246(f).

but unlike subsections (d) and (e), it does not expressly state the evidentiary standard the court must use to make that determination.[2]

Given subsection (f)'s silence on the specific issue of the degree of proof required, it is reasonable to assume that Congress's silence is precisely that—silence. *See Zuber v. Allen*, 396 U.S. 168, 185 (1969) ("Legislative silence is a poor beacon to follow in [statutory interpretation]."). And when, as in subsection (f), Congress is silent on a particular matter, the Court "must presume that Congress is aware of the legal context in which it is legislating." *Battle v. Ledford*, 912 F.3d 708, 717 (4th Cir. 2019) (internal citation and quotation marks omitted). Here, that context includes the understanding that when "Congress has not prescribed the appropriate standard of proof and the Constitution does not dictate a particular standard, [the Court] must prescribe one." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).[3]

In determining the appropriate degree of proof the Court should prescribe for subsection (f), we are not operating on a blank slate. That's so because the Supreme Court and this Court have long recognized that the presumptive degree of proof required in

---

[2] Subsections (g) and (h) discuss releasing certain individuals to one of the States or the District of Columbia, and have no bearing on the issues in this case.

[3] As my recitation of and reliance on these general principles should reflect, the majority opinion mischaracterizes my approach. I do not suggest that Congress has adopted a preponderance standard *sub silentio*. *Ante* at 94–95. To the contrary, I recognize that the text of § 4246(f) is silent on which standard of proof applies and that its silence requires this Court to supply the proper standard by applying standard tools available to us to fill that void. As the majority recognizes, our disagreement lies in which rules and principles best guide us in carrying out that task rather than the conclusion they direct us to reach.

federal civil cases is a preponderance of the evidence, and that presumption is overcome only when the Constitution or statutory language requires a heightened standard. *Id.* at 389–90; *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989) ("[O]ne of the [conventional rules of civil litigation] is that parties to civil litigation need only prove their case by a preponderance of the evidence. Exceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action . . . against an individual."), *superseded by statute on other grounds*, Civil Rights Act of 1990, 42 U.S.C. § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–99 (2003) (citing *Price Waterhouse* and observing that Congress' "failure to" require a heightened showing "is significant, for [it] has been unequivocal when imposing heightened proof requirements in other circumstances, including in other provisions of" the title under review). Because subsection (f) does not explicitly require a heightened degree of proof, the preponderance-of-the-evidence standard applies absent a requirement of the Constitution or an applicable statute.

The Constitution does not require a heightened standard for a revocation-of-conditional-discharge proceeding. The Supreme Court has held that the Constitution requires an *initial* civil commitment determination to be made using a clear-and-convincing-evidence standard, but it has never indicated that a heightened standard remains necessary in subsequent decisions relating to the same civil-commitment decision of the same individual. In *Addington v. Texas*, 441 U.S. 418 (1979), the Supreme Court reiterated that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," *id.* at 426, and required greater than a preponderance of

103

the evidence and yet less than the criminal standard of proof beyond a reasonable doubt, *id.* at 426–33. The Court cited numerous reasons why the Constitutional demands of due process required the initial commitment decision to be made by a heightened degree of proof, including the "social consequences to the individual" ("stigma"), *id.* at 425–26; and the "gravity" of the state's decision "to justify confinement," *id.* at 427. These constitutional prerogatives supported a clear-and-convincing-evidence standard to civilly commit someone as part of the initial commitment decision under § 4246(a)–(d).

Subsequent decisions related to discharge that flow as a consequence of that original commitment do not similarly require a heightened degree of proof. This is in part because the original due-process concerns that led the Supreme Court to require a heightened degree of proof have already been largely satisfied in the initial proceeding. The issue in subsequent post-commitment proceedings is the separate concern as to when that commitment should change form. That's an inherently different inquiry.[4]

In an analogous example from criminal law, consider an initial criminal sentence of imprisonment and the later revocation of supervised release. While an individual can be sentenced to imprisonment only after being found guilty of a criminal offense beyond a reasonable doubt, that same individual can be reimprisoned based on a revocation of supervised release based on violations—criminal or not—that need only be found by a

---

[4] This conclusion does not implicate a subsequent civil commitment following *un*conditional discharge from an earlier commitment. In that event, the government must start a new commitment proceeding and must satisfy its burden anew. That's a different inquiry than presented here, where conditional discharge and revocation of that conditional discharge both occur under the parameters of the initial civil commitment.

104

preponderance of the evidence. *E.g.*, *Johnson v. United States*, 529 U.S. 694, 700 (2000) ("Although such violations often lead to reimprisonment, the violative conduct need not be criminal and need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt."); *United States v. Armstrong*, 187 F.3d 392, 394 (4th Cir. 1999) ("[I]n [a revocation of supervised release] proceeding[], findings of fact are made under a preponderance-of-the-evidence, rather than reasonable doubt, standard, the traditional rules of evidence are inapplicable, and the full panoply of constitutional protections afforded a criminal defendant is not available." (cleaned up)); *see also United States v. Cunningham*, 607 F.3d 1264, 1268 (11th Cir. 2010) (per curiam) (collecting cases from multiple circuit courts recognizing that different due process concerns exist in the context of the revocation process than the initial sentencing decision because the former flows directly from the latter); *United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005) ("[A] violation of supervised release is not a separate basis for criminal punishment that requires a jury verdict and all that that entails. Imposition of supervised release is authorized by the original conviction, and so too are the consequences of its violation. Revocation required only a finding by a judge under a preponderance of the evidence standard." (internal citations and quotation marks omitted)).[5]

---

[5] In *United States v. Haymond*, 139 S. Ct. 2369 (2019), the Supreme Court articulated a caveat to this general understanding when a statute imposed a *new*, mandatory term of imprisonment distinct from the defendant's original sentence based on the conduct that caused the revocation of supervised release. But these nuances are not relevant for present purposes.

If that principle applies between an initial decision to imprison someone under the highest degree of proof—reasonable doubt—and a later decision to revoke supervised release, it applies all the more so as between an initial decision to civilly commit someone and a later decision to revoke conditional discharge. In the context of either the criminal or civil revocation, the court is not imposing anything new, but rather reverting to the status that had already been authorized in compliance with constitutional due process. The subsequent decision to "revoke" the prior conditional relief does not implicate the Constitution in the same manner as the original decision, but is, instead, "anull[ing] by recalling or taking back." *Webster's Third New International Dictionary* 1944 (3d ed. 1961); *see Johnson v. United States*, 529 U.S. at 706 (discussing the definition of "revocation" in the context of supervised release proceedings). Accordingly, the Constitution does not require a heightened standard to be used in a revocation-of-conditional-discharge proceeding under subsection (f).

While Congress could impose a heightened degree of proof, it did not do so here, and subsection (f)'s function within § 4246 reinforces the conclusion that a preponderance-of-the-evidence standard applies to a district court's determination to revoke conditional discharge. As already noted, subsection (f) is silent on this issue, so Congress has not explicitly imposed a heightened statutory degree of proof. Nor does any other provision of § 4246 imply that subsection (d)'s heightened standard carries over to subsection (f). To the contrary, requiring clear and convincing evidence to revoke discharge would "undermine[]" "the internally coherent structure of Section 4246." *Sealed Appellee*, 665 F.3d at 622; *see also Lockhart v. United States*, 577 U.S. 347, 352 (2016) (pointing to the

106

"internal logic of" the statutory language as a beginning point for understanding a provision's context). It would do so in at least two ways—first, by impeding proper operation of subsection (e)'s preponderance-of-the-evidence standard and, second, by creating an incentive for individuals on conditional discharge to violate the requirements of their release because re-commitment would require a heightened standard of review. *See Sealed Appellee*, 665 F.3d at 622–23.

The connection between authorizing discharge or conditional discharge under subsection (e) and revoking conditional discharge under (f) makes it appropriate to carry over subsection (e)'s express preponderance-of-evidence standard to subsection (f). As described above, subsection (e) states that a determination to discharge or conditionally discharge someone must be made based on findings supported by a preponderance of the evidence. Conditional discharge is appropriate when a preponderance of the evidence shows that an individual's "conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily injury to another person or serious damage to property of another." § 4246(e)(2). In that event, the district court has authority to order certain conditions of release, including a "prescribed regimen of medical, psychiatric, or psychological care or treatment." § 4246(e)(2)(A) & (B). Subsection (e) further provides that "at any time," the district court may hold a hearing "employing the same criteria" at which it may "modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment." § 4246(e).

But individuals conditionally discharged under subsection (e) are subject to subsection (f)'s provisions permitting revocation of their conditional discharge.

107

Specifically, subsection (f) authorizes a district court to revoke discharge upon determining, after a hearing, that the conditionally discharged individual has violated a condition of his discharge and that as a consequence his "continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." § 4246(f). Because subsection (f) permits a court to undo what subsection (e) authorizes, the two determinations are tethered in a way that makes it germane and appropriate to use the same standard of proof. To put a finer point on it, as between these two subsections, the original decision to permit conditional discharge requires certain findings by a preponderance of the evidence, one of which is that "release under a prescribed regimen . . . would no longer create" the risk that authorized commitment in the first instance. § 4246(e)(2). But upon proof that he has violated the terms of the prescribed regimen, the individual has demonstrated that he cannot abide by the only criteria under which the district court had found it appropriate to reconsider the initial commitment decision. So, in a revocation proceeding, subsection (f) tasks the district court first with finding that a violation of the regimen occurred and then reconsidering whether that violation means that commitment, conditional discharge, or discharge is appropriate going forward. In effect, the provision puts the district court back in the position it was in when originally considering whether discharge was initially appropriate under subsection (e). The same standard logically applies to both subsections.

Further, the final sentence of subsection (e) provides that the "court may at any time, after a hearing employing the same criteria, modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment." That the conditions of discharge can be

108

modified or eliminated based on a preponderance-of-the-evidence standard provides further support for the conclusion that the conditional discharge itself should be revoked under subsection (f) using that standard. *See Sealed Appellee*, 665 F.3d at 623 ("This subsection (e) evidentiary showing necessary to modify or eliminate conditional release should not be circumvented by persons who violate terms of release yet then oppose revocation and commitment on the ground that the district court must re-find clear and convincing proof of a substantial risk of harm.").

This interpretation makes practical sense not only of these two adjoining and interrelated subsections, but also of § 4246 as a whole. Requiring clear and convincing evidence for subsection (f) could create an incentive for individuals who are conditionally discharged to violate their conditions of release. An individual already found to be subject to commitment under subsection (d) could obtain conditional discharge under subsection (e)'s preponderance-of-the-evidence showing, violate the terms of that discharge, and then force litigation *over the consequences of his violation of the terms of the discharge* under subsection (d)'s heightened standard of proof. *See Sealed Appellee*, 665 F.3d at 622 ("A contumacious person could violate release conditions yet continually relitigate against commitment under subsection (d)'s clear and convincing proof standard."). There is no indication that Congress mandated such a result, particularly *sub silentio*.

For these reasons, I agree with the majority that a preponderance-of-the-evidence standard is appropriate for revocation of conditional discharge under subsection (f). There may be additional support for this standard in historical underpinnings and analogous

statutory provisions, as the majority relies on, but I do not believe they are necessary to reach this conclusion and stray in some instance outside the record.

## II.

The second issue before the Court is whether the district court made adequate factual findings under subsection (f) to support its decision to revoke Perkins' conditional discharge. As noted, subsection (f) requires the district court to make two findings—(1) the conditionally discharged individual "fail[ed] to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment," and (2) that, in light of those violations, "his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." As the majority opinion recites at greater length, although the district court twice found that Perkins violated several conditions of his discharge, its explanation was limited to noting which violations it found to have occurred. *Ante* at 5–10, 57–58. Moreover, this Court specifically remanded the case at the Government's request so that the district court could hold a further hearing on subsection (f)'s additional requirement that Perkins' "continued conditional release would create a substantial risk of bodily injury to another person or serious damage to property of another." However, on this point, the court failed to provide any relevant findings at either hearing. Instead, it expressed "hope [that] the Fourth Circuit will amplify what it meant by having to find [this] additional requirement[]," J.A. 139, and simply concluded, "the violations heretofore set out depicting the conduct of the defendant during his release

110

would create a substantial risk of bodily injury to another person or serious damage to the property of another," J.A. 141.

I agree with the majority opinion that this record provides an insufficient basis to affirm the district court's order. At the outset, it's not clear from the record that the district court used a preponderance-of-the-evidence standard for both required findings. More problematically, as the majority opinion observes, "the district court collapsed both inquiries of § 4246(f) into a single question, focusing only on whether Mr. Perkins violated conditions of his release and not explaining why 'in light of' those violations his continued release created a substantial risk to other persons or property." *Ante* at 92.

Congress enacted an intentionally broad standard that permits the district court to consider on remand whatever evidence it deems relevant to making its determination. As the text of subsection (f) states, to revoke conditional discharge, district courts must find both that violations of conditional discharge occurred and that those violations mean that the individual's continued conditional discharge would "create a substantial risk of bodily injury to another person or serious damage to the property of another." In most cases, this will entail a relatively straightforward comparison of the original grounds for civil commitment, the reasons why discharge was conditioned on the prescribed regimen, and how the violation of those conditions leads back to the risks associated with non-compliant discharge. Nothing in the provision suggests that the inquiry requires a detailed evidentiary hearing of the sort contemplated for initial commitment under subsections (a) to (d).

The majority opinion's comprehensive discussion of factors that *may* be relevant in a particular proceeding delves beyond the scope of subsection (f) and seems more

111

appropriately covered in the context of what might be required in an initial commitment proceeding. I do not join its discussion on this point because it offers a detailed framework that Congress did not prescribe and ventures well beyond the record. And, by articulating such an extensive list for the relatively straightforward and broad concept articulated in subsection (f), the majority opinion may have inadvertently created a procedural quagmire for district courts and counsel alike in conducting revocation proceedings.

Counsel and district courts know the records in each case and can tailor the arguments and evidence to fit the circumstances. In like manner, district courts can make the requisite findings to support revocation of conditional discharge. Where they do not, that failure can be addressed on a case-by-case basis rather than by articulating a free-standing and expansive list where parts of it may well be irrelevant and misleading in a particular case.

In any event, for present purposes, the district court failed to make *any* findings connecting Perkins' failure to comply with the conditions of his discharge to a determination that "his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." That is sufficient, in and of itself, to require remand.

\* \* \* \*

For these reasons, I concur in the judgment of the majority opinion, which vacates the district court's order revoking Perkins' conditional discharge and remands for further proceedings under a preponderance-of-the-evidence standard.

112